Nott, J.,
delivered the opinion of the Court.
This is an action brought by two civil engineers to recover $24,026 09 damages growing out of a contract made with them by the Oommis sioner of Indian Affairs for the survey of the districts described in the treaty between the United States and the Choctaw and Chickasaw Indians, (J une 22, ] 855,) and the treaty with the Creeks and Seminóles, (August 7, 1856.) The services required by the contract, it is conceded, were well performed, and the price stipulated has been fully paid. Certain “obstructions and hindrances on the part of the United States in the performance of their contract constitute the burden of the claimants’ complaint.”
The case involves three questions, which will he separately considered.
I. In the recent case of Deming against the United States this court decided that a contract between the government and an individual camiot be affected specially by a general law. That principle we now reiterate and extend to the case before us. The “ obstructions and hindrances ” complained of on the part of the United States were the withdrawal of their troops from the military posts in the Indian country, contraiy to the terms of the Indian treaties ; and it is insisted, “as a matter of law,” that “the United States could not change their attitude or their policy in a material degree, “ without incurring the responsibility of making the claimants just compensation for all additional expenses thereby incurred.”
This position cannot be sustained. The two characters which the government possesses as a contractor and as a sovereign cannot bo thus fused; nor can the United States while sued in the oue character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot he deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons. The laws of taxes and imposts affect preexistent executory contracts between individuals, and affect those made with the government, hut only to the same extent and in the same way. In this court the United States appear simply as contractors; and they are to he held liable only within the same limits that any other defendant would be in any other court. Though their *385 sovereign acts performed for tbe general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants. Wherever the public and private acts of the government seem to commingle, a citizen or corporate body must by supposition be substituted in its place, and then the question be determined whether the action will lie against the supposed defendant. If the enactment of a law imposing duties will enable the claimant to increase the stipulated price of the goods he has sold to a citizen, then it will when the United States are defendants, but not otherwise. If the removal of troops from a district liable to invasion will give the claimant damages for unforeseen expenses, when the other party is a corporate body, then it will when the United States -form the other party, but not otherwise. This distinction between tbe public acts and private contracts of the government — not always strictly insisted on in the earlier days of this court — frequently misapprehended in public bodies, and constantly lost sight of by suitors who come before us, we now desire to make so broad and distinct that hereafter the two cannot be confounded; and we repeat, as a principle applicable to all cases, that the United States as a contractor cannot be held liable directly or indirectly for the public acts of the United States as a sovereign.
II. The contract contains the following provision:
“ It is further understood and agreed # * ® that an astronomer shall be appointed by the Commissioner, and his salary, at the rate of $2,500 per annum, to be paid by the said Commissioner out of whatever moneys may be due to the said Jones & Brown for the services herein agreed upon, upon conditions herein expressed, but all other expenses incidental to the performance of the duties required of him, the said astronomer, in the field, to be paid by the said Jones & Brown; and the said astronomer shall be responsible to the United States for tbe determination of such astronomical points as may be necessary to fulfil the conditions of this agreement. Said astronomer shall be allowed ample time and facilities for fixing said astronomical points, viz., the 100th and 9Sth meridians, to his entire satisfaction, provided that not more than six months be exceeded.”
The claimants were at the same time instructed (which instructions were made a part of the contract) as follows:
“ Every line run by you must be upon the true meridian. You will proceed to run the 9Sth and 100th degrees of west longitude from any practical points established by the astronomer as the true meridian. *386 The 9Sth and 100th degrees of west longitude being important geographical lines, requiring careful astronomical observations for their correct determination, you will therefore exert your best ability to discharge this duty to the satisfaction of the government and to your own credit, giving every facility to the astronomer to fix these points upon the ground in accordance with treaty stipulations. The astronomer will therefore be ordered to report to you whenever you signify your readiness to execute the above bounden duty.”
Under these provisions of the contract it was insisted, on the trial, that the delay was in part due to the non-establishment of the initial points by the astronomer, and that “ he was to do this work as the independent agent of the United States.”
This part of the case is an after-thought. There is not one word in the petition charging the government with this responsibility; and, indeed, the petition expressly negatives the idea, for it speaks of the delay of the astronomer as “ beyond Ms control by Indian depredations.” If the evidence relating to this ground had been objected to at the proper time, we should have excluded it for the variance. But inasmuch as it was admitted without objection, and when it was not too late for the claimants to have amended their petition, we feel bound to look into it and see to what extent it might have affected the case.
And first is to be determined the question whether the astronomer was the agent of the claimants or of the defendants. He was to be paid by the Commissioner of Indian Affairs, but out of moneys going to the claimants under the contract — in other words, with their money. He was also to do a part of their work, and his expenses, “incidental to the performance of the duties required of him in the field,” were to be paid by them. But, at the same time, the claimants did not appoint him, and could not discharge him; they could not exercise over him any control; and for the accuracy of his work he was to be “ held responsible to the United States.” Therefore he was no agent of the claimants.
But it does not follow that the delay was the astronomer’s act, or the fault or misfortune of the government. On the contrary, the contract required the claimants to furnish him with “ample facilities for fixing the astronomical points,” which, we think, must be held to include the necessary transportation and a sufficient escort. In fact, the astronomer did not fix the initial points for the reason that the claimants could not convey him to the proper localities. This was their misfortune, and raises no legal liability on the part of the United .States.
*387 There may be, however, two exceptional instances to this.
The testimony in this case is made up chiefly of the opinions and conclusions of the witnesses. As is usually the case with such evidence, it is deficient in the material facts by which the court must form opinions and draw conclusions. It, however, indicates that in April, 1858, the astronomer was sent forward with a small party to fix the initial point of the 98th meridian, while the main body was running the Choctaw and Chickasaw line. Instead of thus proceeding the astronomer halted at Fort Arbuckle, and there waited until the main body came up. The “dates of survey” show that the running of the Choctaw line was completed on the 12th April, and that the running of the 98th meridian was begun on the 22d June; but how long the party was in going from the Choctaw ground to the vicinity of the initial point, and at what time the astronomer began and ended his observations, and how long, in short, the claimants were delayed by the astronomer between the 12th April and the 22d June; do not appear.
It is also indicated by the evidence that some delay may have been caused by the government in fixing the initial point of the 100th meridian, for which the claimants should be reimbursed. The astronomer requests authority “ to continue astronomical observations an additional lunation,” and the Commissioner instructs him, “ that if in your opinion deemed essentially necessary to the proper performance of the work designated, said request will be granted; ” to which the astronomer replies : “ I shall infer from your letter that the wishes of the department are to expend another month if very necessary but the only evidence to show that this permission was acted upon, the court, for reasons presently to be stated, cannot consider.
III. In the third place, this case brings up the important question whether in this court a claimant may be a witness in his own behalf. There has been no case in which the point has been raised and determined. But here the principal, and in some matters the only witness, is Alfred H. Jones, one of the claimants. No specific objection to him as a witness appears on the record, and no question as to the admissibility of his testimony was presented on the trial; yet, inasmuch as a part of his case rests exclusively upon his own testimony, the court of necessity must notice the fact and decide whether it can be received as competent evidence.
There appear to be involved in the question whether a party may testify as his own witness in his own action against the government, two principles. The first of these is that of mutuality, whereby in an *388 ordinary-action the law secures a reciprocal benefit to either party. Under the 14 and 15 Viet., chapter 99, (August 7, 1851,) which is the parent act of the legislation that of late years has overturned one of the cardinal maxims of the common law, such testimony is received where the opposing party is an executor or administrator, and no subsequent statute has amended the act in this particular, (16 and 17 Viet., chapter 83.) But the most of our State legislatures have restricted similar laws to cases where the evidence of the party could not be offered against one who represented another, and who, from the nature of things, must reap a lesser benefit. In the act of Congress under which parties may now offer themselves as witnesses, (St. L., 351, section 3,) no such restriction was imposed, but by a subsequent enactment Congress has established it. (Act March 3, 1865, 13 St. L., 533.)
But where the United States are a party no mutuality of benefit can exist. The government is not, like an individual, cognizant of its own transactions. Those transactions are numberless, dependent on unnumbered officers, and scattered not only through every portion of its wide territory, but through every quarter of the world. The government cannot become a witness for itself; one party would gain, therefore, a convenience, while the other, from the nature of things, could gain nothing. The government must depend upon its agents, and they alone can defend it by their testimony. They are equally within the call of the claimant and equally competent to be witnesses for him. It would not be unreasonable to require that he should produce those with whom he dealt; but this the law does not impose; it only leaves him free to resort to them. If they be absent, he will be the party best able to find them. If they be dead, it will be his misfortune, and the United States will be equally without witnesses to establish their defence.
It may be answered that the government is like a corporation, which acts by its officers, and which has been held to be a living person within the meaning of kindred statutes/ and against which parties are allowed to testify. But there is no justness in likening a little assemblage of men, associated voluntarily for their private gain, and having their individuality covered by a legal fiction, to the great body politic of the nation, where all have equal rights and equal interests, and where the officer of the government is as much the agent of the party calling him as of the President, and where the claimant possesses as great an interest in his testimony as does any other citizen in the realm. Therefore we must hold, that if this act extends to the' claim *389 ant, and makes liis testimony competent, which at the common law is incompetent, it was the intent of Congress to confer upon one party to the action an exclusive benefit, and that the statute must be so construed. It is needless to say that we hesitate to place upon the statute such a construction, and can do so only when, from all its provisions and purposes, we are satisfied that such was the legislative intent.
The second and more important principle involved in this branch of the case is the principle generally known, but rarely invoked, that “ the King is not bound by any act of Parliament, unless he be named therein by special and particular words.” (1 Blks., 201.) The rule and the exceptions to it were laid down in Coke’s time, (5 Rep., 14; 7 Id., 32; 11 Id., 74;) and they have not been changed or departed from to this day. It is the exceptions that we have now to consider, and they are enumerated in the books as “acts for the advancement of religion, providing for the poor, and the prevention of wrong and to these may be added a fourth exception, embracing, as Woodeson says, (1 Woodeson, 31,) “such inferior claims as might belong indifferently to the King or to a subject, as the title to an advoioson or a landed estate.” I have been able to discover no case in either the American or English courts which does not fall within one of these four classes; yet, as this question is one of unusual importance, and one upon which the court is divided, it will be proper to examine these cases more particularly.
And first, there is a class of cases dependent upon the maxims of the common law, that time runs not against the King, and that laches cannot be imputed to the Crown, which are numerous and universally acknowledged and known ; for no one at this day will pretend that the government is barred by a statute of limitations, be the language thereof ever so comprehensive and positive. These cases, indeed, come under the rule; yet inasmuch as they depend on a particular and very cogent reason of their own, I attach to them but little weight so far as the case now under consideration is concerned. Of such, perhaps, the strongest in this country is The United States v. Hoar, (2 Mason, 314,) where Mr. Justice Story lays down the rule as broadly as in any of the English decisions; and the case of Josselyn v. Stone, (28 Miss. R., 753,) where the Supreme Court says, “ The general words of a statute do not include the state or affect her rights unless she be specially named, or it be clear and indisputable from the act that it was intended to include the state.” To these may be added the case of The Commonwealth v. Baldwin, (1 Watts, 54,) where Chief Justice Gibson with great and characteristic power reviews the *390 American cases, and establishes the conclusion that “ this prerogative is a principle of our government, and a part of the law of the land.”
Of the English cases which have been chiefly noted and relied on as establishing’ exceptions to the rule, I may instance, first, “ The case of Ecclesiastical Persons,” (5 R, 14 b.) By the act of 13 Eliz., cap. 10, ecclesiastical persons were restrained “ to make any lease,” and where one was made to the Queen it was held to be void. But this was a statute to prevent the decay of religion, and therefore one of the established exceptions. Yet even here the judges are careful to point out the admitted exceptions, and to explain the reason, viz., “ for religion, justice, and truth are the sure supporters of tho Crown, and the diadems of kings.”
In the great and leading case of Magdalen College, (11 R., 73,) all the learning of Coke is displayed, and the rule and its exceptions closely reviewed. But here, in addition to the reason in the Case of Ecclesiastical Persons, there appeared this very sufficient reason, viz : “ The intent of the masters and fellows was that they would convey the said house to Benedict Spinola and his heirs; and because they could not do it de directo they attempted to do it ex obliquo, to grant it to the Queen and her successors, but upon condition that the Queen within three months should grant the said house to the said Benedict Spinola.” “ So that, it was endeavored that the Queen, who was the fountain of justice, should thereby be made the instrument of injury and wrong.”
In Beaumont’s case (2 Inst., 681) the question arose out of tho statute of discontinuances, (32 Henry VIII, cap. 28,) which act provided that no fine suffered by the husband only shall make a discontinuance prejudicial to the wife. Of this statute the court says: “Albeit the King is not named in the act, yet is he bound by the act, because it is made to suppress a wrong.” To which is added, “ Every discontinuance worheth a wrong, and the King, being God’s lieutenant, cannot do a wrong.”
The case of Willion v. Berkley (Plowden, 226 a) arose from the statute de donis conditionalibus. Before the statute, a gift to a man and the heirs of his body, remainder to tho donor, would not revert; and it was held that there was no remainder, and that the grantee took a fee. The grant being to the King, here, the question was, whether he became bound bythe act. On this question the court stood divided. Justice Weston held that the King was not bound by the act; but Justice Anthony Brown held otherwise: “ For the person of the King is not to be respected in gifts of land, but the quality of the estate is *391 to be considered; and the person of the King shall not rule the estate in the land, but the estate in the land shall rule the person of the King.” And he also said: “ Then, as to the statute, it ^vas intended to repress a mischief and a grievance.”
Dyer, Chief Justice, went still further: “And as 1o what is said, that the King shall not be bound by the act, and that there shall not be any restraint in the estate which he takes, unless the same be precisely expressed in the act, sir, I admit that in some cases the King shall not be restrained by general words without express restraint in the act, and that is according to the matter of the act; but in this act he' shall be bound, for it is made for the furtherance of restitution— that is to say, where it was a great abuse that the donee had the power of aliening after issue had, (which, being a common error, was taken for the common law,) this statute was made to reform the abuse, and to restore the common law in this point to its right and just course, which it did, by restoring to the donor the observance of his intent.”
So it appears that there are three reasons why the decision is no authority in this case : First, because it related to property of the King as a natural person; second, because the act did not affect or restrain any pre-existent prerogative of the Crown; and, third, because the judges assigned reasons which show that they believed the act to be for the suppression of wrong and the restoring of the common law.
In The King v. Archbishop of Armagh, (Str., 516,) which was a case where the archbishop had “ consolidated the rectory and vicarage,” under the act of 10 Car. I, judgment was for the King, though upon other grounds. 33ut Justice Eyre said : “ Jthinli this statute will extend to the Croum, because it does not deprive the Crown of any prior right, but only new models it.” The case is, therefore, no authority, being for the King; and the dictum shows that in no eveut would it have been authority, for the statute took away no prior right.
Rex v. Wright (1 Ad. & El., 434) was the case of an appeal, under 11 Ceoigo IV and 1 William IV, cap. 70, where it was objected that the act did not bind the Crown, and that a writ of error would not lie to the Exchequer Chamber in a case where the Crown was a real party. It was held that the appeal did lie. But per Chief Justice Tindal: “The act itself is entitled ‘An act for the more effectual administration of justice,’ and the preamble of the act declares its intention to be ‘to make more effectual provision for the administration of justice in England and Wales.’ And, again, the eighth section, by which this court is constituted, is expressed in terms the most general and ample: ‘That writs of error upon any judgment given by any of the said *392 courts shall hereafter he made returnable only before the judges or judges and barons, as the case may be, of the other two courts in the Exchequer Chamber.’ In the case, therefore, of an act of Parliament passed expressly for the further advancement of justice, and in its particular enactment using terms so comprehensive as to include all cases brought up by writ of error, we think there is neither auihoiity nor principle for implying the exception of criminal cases zepon the ground that the King, as public prosecutor, is not expressly mentioned in the act.”
In the case of De Bode v. Regina, 14 Jur., 970, which was founded on a petition of right, the court of highest legal authority in England, the Exchequer Chamber, reviewed the case of Rex v. Wright, and again held that an appeal would lie though the Crown were a party. Tet here Lord Chief Justice Wilde expressly says :
“ If any special prerogative of the Grown was thereby taken aioay— as, for instance, if there had been a special tribunal for the decision of wits of error brought by the Grown, or where the Grown toas a party; or \if\ the Crown had, an option, which the subject had not, to have a writ of error, against the judgment, in itsfavor in any court that it should elect — doubtless such a prerogative would not be-taken away.”
I shall endeavor presently to show that the case at bar complies with these conditions ; that the United States have a special tribunal for the decision of actions brought against them ; that within that tribunal they have a statutory right to use or withhold the testimony of an opposing party; and that this right is a special prerogative which cannot by general words or ordinary implication be taken away.
Of the cases wherein it has been decided that the government is not bound by the general words of statute, the first which I shall notice is that of The Attorney General v. Lancelot Allgood. (Parker, p. 1.) In it great learning is displayed and all the preceding cases are reviewed, and, moreover, it is cited and approved in the case in the Exchequer Chamber, which has been quoted, (De Bode v. Regina.) The action was an “information of intrusion.” On behalf of the defendant the court was moved for leave to plead three several matters as allowed by the statute of 4 Anne, c. 16. It was insisted that the King, not being expressly named, was not bound by the act; and on that point the Lord Chief Baron used language which I think not inapplicable to the case before us:
‘‘But it is further observable that two of the reasons upon which the cases cited by the defendant’s counsel are founded, viz., the advancement of religion and the suppression of fraud, totally fail in the present *393 case, and tlie remaining consideration is, whether the restraining of a defendant from pleading several matters in his defence was a wrong of such a nature as these cases allude to. And it seems to me pretty extraordinary to charge a rule of the common law (which prevailed for centuries, as appears by Co. Lilt., 903 a) with such an imputation; and it will afford no argument that this was a wrong, within the meaning of these cases, to say that the public wisdom of the nation has made an alteration.”
There are numerous cases to the same effect, of which a few may be taken for analogy. It appears by The King v. Allen, (15 East., 333,) that the statute of 48 Geo. Ill, cap. 74, which provides that with respect to the duties on malt the decision of the sessions shall be final “between the parties,” and that no certiorari shall be allowed, “does not preclude the Grown from removing the conviction and the order of the sessions quashing the same by certiorari.” And it appears by The Attorney General v. Newman, (1 Price, 438,) that a provision in the malt act limiting the Crown to five years within which to commence suits for duties, is not continued by subsequent acts on the same subject, even though they refer to it, and that “it is a clear rule that the right of the Grown is not to be taken away by doubtful words or ambiguous expressions.” And it appears by The King v. Cook, (3 Term R., 522,) that although, by the statute 25 Geo. Ill, the postmaster was required to take “from the person or persons hiring” post-horses a stamped receipt, and had neglected to do so of a government courier, yet — per Lord Kenyon — “ Now although there was no special exemp/tion of the King in this act of Parliament, yet I am of opinion that he is exempted by virtue of his prerogative.”
But a stronger and more modern case is that of Mountjoy v. Wood, in the Court of Exchequer, (1 Hurlstone & Norman, 58,) where it was “moved on the part of the Crown to remove into the court a cause” wherein the defendant sought to recover one pound. “The application was founded on the prerogative of the Crown to remove into the Court of Exchequer any cause commenced in any other court touching the Crown revenue.”
Pigott Sergeant showed cause that “ The jurisdiction of the court is taken away by 9 and 10 Vic., c. 95, s. 90, ivhich enacts ‘ That no plaint entered in any court holden under that act shall be removed or removable from the said court into any of her Majesty’s superior courts of record, by any writ or process, unless the debt or damage claimed shall exceed ¿65.’ ”

Per curiam,

“ The Crown always had a prerogative to remove into *394 this court causes affecting the revenue, and that right is not taken away by the enactment referred to.”
Of American decisions which are not founded upon the maxims respecting time and laches, I have found but one, which is that of The People vs. Rossiter, (4 Cowen, 144;) and it, apparently, received'but little attention from the very learned and able court that considered it. The defendant was imprisoned upon ca. sa. after he had executed an assignment in bankruptcy, under an act which declared that upon executing such an assignment a party should be exempt from imprisonment “ by reason of any debt or debts.” The court refused to discharge the defendant, and said, “ The King is not bound by a bankrupt law unless named.”
There is, however, an English case bearing closely upon the question, and even growing out of the English statute to amend the law of evidence, 14 and 15 Vict., c. 99. This case is that of The Attorney General against Radcliff, (10 Hurl. and Gord. Exch., p. 84,) and the facts are these:
An information for the Crown was filed by the Attorney General against the defendant to recover penalties for violations of the revenue laws. The defendant offered himself as a witness at the trial, and was rejected as incompetent. On a rule nisi for a new trial the court was equally divided. Two of the judges regarded the information as a civil, while the other two regarded it as a criminal proceeding; but all were agreed that if the defendant were not excepted by the third section of the act, which excepted criminal proceedings, he would be a competent witness. The question now considered was not discussed by the court, nor, apparently, much relied upon by counsel. .But the point was raised by the Attorney General, who said, ‘‘ As an additional argument the Crown is not named in the act, and, consequently, is not bound by it.” To which Pollock, Chief Baron, answered, on the argument: “ The Crown is not bound with reference to matters affecting its property or person, but is bound with respect to the practice in the administration of justice.”
As has been said, the point was not further considered by the court, and the dictum of the Chief Baron is much too broadly stated to be of great authority; yet the learning and experience of the court, particularly in matters relating to the prerogatives of the Crown, render this a very strong case against the government, which I probably should be willing to adopt as the decision'of this court, but for the particular reasons now to be stated.
The act of Congress which establishes this new law of evidence *395 does not possess the formality and care usually awarded to so important a statute, being simply a proviso in the civil appropriation act of 1864, and in these words :
“Provided, That in the courts of the United States there shall be no exclusion of any witness on account of color, nor in civil actions, because he is a party to, or interested in, the issue tried.” (13 Stat. L., p. 351, s. 3.)
Within one year after its passage the attention of Congiess was drawn to the fact that they had legislated more largely than liad been intended, and the proviso was reduced by an enactment providing that “ in an action by or against executors, administrators, or guardians,” “neither party shall be allowed to testify against the other as to any transaction with, or statement by, the testator, intestate or ward.” (Act March 3, 1865, 13 Stat. at Large, 533.) The congressional records show that the first part of the proviso, respecting color, was offered by Senator Sumner, as an amendment to the bill before the Senate; that Senator Buckalew thereupon moved to add the second part, relating to poarties, and that the proviso thus amended was adopted, by the Senate. (Cong. Globe, Part IV, p. 3259.) And this leads us to inquire what were the facts and circumstances which suggested and called for this piece of legislation.
The judiciary act provides that “the laws of the several States” “ shall he regarded as rules of decision in trials at common law in the courts of the United States, in cases where they apply.” (1 Stat. at Large, p. 81.) And the act of July 6, 1862, (12 Stat. at Large, p. 588,) provides that “ The laws of the State in which the court shall he held shall he the rules of decision as to the competency of witnesses in the courts of the United Slates, in trials at common law, in equity, and admiralty.”
By the phrase “ courts of the United States ” was meant the courts held in the different States, and it has never been supposed that these acts shall be extended to this court, although this is one of the “courts of the United States.” Under this rule a most diverse practice had grown up in the “courts of the United States” dependent upon and caused by the local law of the respective States in which they were held. In some circuits witnesses were excluded on account of color, in others on account of interest, and in others because they were parties; while, on the contrary, in certain other circuits all of these reasons combined were not a sufficient cause to exclude them. Congress, therefore, passed the act declaring that “ in the courts of the United States there shall he no exclusion of any witness on account of *396 color, nor in civil actions because he is a party to, or interested in, the issue tried.” Blit, for the foregoing reasons, I incline to believe that by “ courts of the United States ” Congress meant those courts of the United States to which the judiciary act extends; and by “civil actions,” those civil actions between citizens which had become subject to different and inconsistent rules of decision.
But above and beyond these reasons is one on which I am disposed chiefly to rest this decision. One year before the statute amending the law of evidence, Congress passed the act reorganizing and reconstructing this court. (12 Stat. L., 765.) Prior to it, the court had consisted of three judges, whose decisions took the form of reports to Congress, which awarded thereon to the suitors their only remedy. By it the court is raised to five judges; its jurisdiction is extended from claims “founded upon any law of Congress or upon any regulation of an executive department, or upon any contract expressed or implied,” (10 Stat. L., p. 612,) to “ all set-offs, counter claims, claims for damages, whether liquidated or unliquidated, or other demands whatsoever, on the part of the government;” (12 Stat. L., 765;) and it is empowered to render judgments for, as against, the United States. From certain of these judgments an appeal is given to the Supreme Court of the United States, but otherwise they are made final and conclusive ; and those rendered against the government are to be paid directly by the Secretary of the Treasury without the interposition of Congress, and without any further or special appropriation being made therefor. Finally, this court, thus constituted, with such prompt and ample means of redress, exceeding those appertaining to “ the petition of right” at the common law, (3 Blks., 255; Viscount Canterbury v. Regina, 7 Jurist, 224,) is open to every citizen who, by the mere filing of his petition, can become a suitor, and, as a matter of right, have his controversy with his government adjudged by the fixed and impartial principles of justice which determine the rights of individuals in courts of law. Nevertheless, it was further enacted at the same time, and made an implied condition to the trial of the suit, (sec. 8,) that it should be lawful for the United States, through their solicitor, to require any claimant to appear “ and be examined on oath or affirmation touching any or all matters pertaining to his claim.” And this right is not made reciprocal and given to the claimant by the act; for not only does the silence of the statute retain the rule of the common law, but it also expressly restricts the claimant from the benefits of his evidence so taken; for it expressly provides that the evidence shall he taken at the instance of the government, and that when so *397 taken and filed it may “ be read and used as evidence on the trial,” only “at the discretion of the solicitor of the United States.” A privilege thus primarily connected with the remedy of the claimant, thus positively engrafted upon the very organism of this court, becomes therein, in my judgment, a statutory prerogative of the government, which cannot he repealed by the implication of subsequent statutes, and which can only be taken away by “ special and particular words.”
I think it, therefore, established that by the act reorganizing this court, the government was invested with an exclusive right to take the testimony of claimants, an exclusive right to use it, an exclusive right to withhold it; and that if the statute changing the law of evidence be construed to embrace the government within its purview, this exclusive right will be taken away. If it be said that this statute is in accordance with the enlightened policy of modern legislation, I can only answer that Congress could hardly have so changed their policy in a single year. If it bo said that the statute is remedial in its nature and for the advancement of justice, I must reply that such acts only include the government when the government will be equally benefited thereby; that, as in the case put by Chief Justice Wilde in De Bode v. Regina, hero is a “ special tribunal ” for the decision of ' actions against the government; here the government has an “ option which the subject has not: ” here the government may “ elect” to use or to withhold the testimony which it alone may call forth; and these constitute a prerogative, which it was not intended the act should take away. If it be said that the statute is an act for the suppression of wrong, and that the restraining of a claimant from using his own testimony to advance his own case is a wrong, I may best refute it by replying with Chief Baron Parker, in The Attorney General against All good, that this “ is not a wrong of such d nature as these cases allude to. And it seems to me pretty extraordinary to charge a rule of the common law (which prevailed for centuries) with such an imputation ; and it will afford no argument that this was a wrong, within the meaning of these cases, to say that the public wisdom of the nation has made an alteration.”
It has been suggested that if parties cannot testify, persons of color cannot, as both are rendered eligible by the same act. There was never a law of Congress which excluded witnesses on account of color ; and this court has always recognized the rules of the common law, which make no such distinctions. It is not so with parties. They have been ever excluded, and are still, except where made competent *398 by statute. The reasons which conclude them from testifying against the government do not apply to the testimony of a disinterested though colored witness. If this statute never had been passed, this court would not exclude a witness on account of color • nor does it admit him now by virtue of the statute. The court knows no rule by which it can exclude him ; nor does it look to the law of Maryland as the rule of its decision. And if the act were necessary to make such a witness competent, it might still so operate ; for though one of its provisions affects a prerogative of the government, the other does not, and the latter is not dependent on the former.
There still remains one statute supposed to affect this question. On the same day that Congress passed the proviso in the civil service act, a statute, carefully drawn, and closely patterned after the 14 and 15 Viet., was enacted, which is entitled “ An act relating to the law of evidence in the District of Columbia,” (13 Stat. L., 374.) By this it is declared that “ on the trial .of any issue * * in any suit, action or other proceeding in any court of justice in the District of Columbia, # * * the parties thereto * * * shall be competent and compellable to give evidence.”
The courts in the District of Columbia were established as early as 1801 by “An act concerning the District of Columbia,” (2 Stat. L., 103.) It provided that the District should be “ formed into two counties ; ” that there should be “ a court in said District, which should be called the circuit court of the District of Columbia ; that there should be appointed in and for each of said counties,” justices of the peace, and “a judge, to be called the judge of the orphans’ court.” There was also “ An act to establish a criminal court in the District of Columbia,” passed July 7, 1838, (5 Stat. L., 306 ;) and finally, in 1863, “ An act to reorganize the courts in the District of Columbia, and for other purposes,” (12 Stat. L., 762.)
The Court of Claims is not a court “ in the District of Columbia.” Its sessions chance to be held at the city of Washington, but its jurisdiction extends throughout the United States. It issues writs to every part of the country, and is specially authorized to enforce them, (10 Stat. L., p. 612, § 3.) There is no reason why it should not sit beyond the limits of the District, and if occasion required, it would not hesitate to do so. It has never followed the practice of the courts of Maryland, nor been affected nor limited by her local laws. Other courts are courts c/The United States for particular States or districts; the Court of Claims is a court of the United States for the United States, and for no particular State or district. Its jurisdiction is as great and as *399 limited elsewhere- as here, and here as elsewhere. By “ courts in the District of Columbia,” Congress must mean those courts which have been known, hitherto, by that designation, or else courts whose jurisdiction is “in the District of Columbia.” The Court of Claims is neither one of the courts thus designated, nor a court whose jurisdiction is restricted to the District. The act referred to, therefore, does not extend to it.
Mr. T. J. D. Fuller for the claimant.
Mr. J. J. Wbed, Assistant Solicitor, for the government.
Under the peculiar circumstances of this case, we are inclined to treat the claimants with leniency, and therefore direct that they amend their petition, so as to charge the United States with the delay in fixing the initial points of the 98th and 100th meridians, as indicated by this opinion; that the case then be restored to the docket, but that any' evidence which the claimants may then produce be taken in the city of Washington at the convenience of the Solicitor of the United States, and be restricted to these two points, viz:
1. To establish the length of time the claimants were delayed after their arrival in the vicinity of the initial point of the 98th meridian before such an initial point was established by the astronomer in June, 1858, and also the amount of their expenses during this period, and also the value of their services.
2. To establish the fact that the astronomical observations were continued an additional lunation, as authorized by the instructions of the Commissioner of Indian Affairs, dated December 1, 1858, and the extent of the delay thereby actually occasioned in establishing the initial point referred to, and also the amount of the claimants’ expenses, and the value of their services during such period.