**SUNSWICK CORPORATION OF DELA-
WARE v. UNITED STATES.**

No. 46696.

Court of Claims.

Jan. 5, 1948.

Richard H. Tunstead, of New York City (Spencer & Iserman, of New York City, on the brief), for plaintiff.

S. R. Gamer and John F. Sonnett Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and LITTLETON, HOWELL, MADDEN and WHITAKER, Judges.

LITTLETON, Judge.

Plaintiff sues to recover $11,492.93, plus overhead and profit, for increased labor costs incurred in the performance of a lump sum construction contract entered into with defendant September 21, 1944, covering a certain canal improvement and reconstruction project of the Corps of Engineers, War Department, on the St. Mary's Falls Canal in Sault Ste. Marie, Michigan. The increased costs resulted from the payment by plaintiff of a higher wage rate to carpenters working on the project than that specified in the contract specifications, by reason of plaintiff's compliance with a directive order of the Wage Adjustment Board issued on January 10, 1945, directing plaintiff to pay such increased rate retroactively to the beginning of the project.

The contract specifications, prepared by defendant and upon which plaintiff relied in the preparation of its bid, fixed the minimum wage to be paid journeymen carpenters on this project at $1.25 per hour, and provided that the wage specified "shall be the maximum wages to be paid, subject, however, to Executive Order No. 9250 [50 U.S.C.A.Appendix, § 901 note], and the General Orders and Regulations issued thereunder." Before submitting its bid plaintiff investigated the labor situation at Sault Ste. Marie, as the defendant had done, and found that the prevailing rate for carpenters was $1.25 per hour, as indicated in the specifications, and that an adequate supply of carpenters could be obtained at that rate. Relying upon this investigation and upon the wage and other provisions of the contract and specifications, plaintiff made no allowance in its bid for an increase in wage rates.

Article 17 of the contract entered into by plaintiff and defendant, following the acceptance of plaintiff's bid, directed the contractor to pay all labor employed directly upon the site of the work at wage rates "not less or more than those stated in the specifications (subject to Executive Order Number 9250 and the General Orders and Regulations issued thereunder) regardless of any contractual relationship which may be alleged to exist between the contractor or subcontractor and such laborers and mechanics; and the scale of wages to be paid shall be posted by the contractor in a prominent and easily accessible place at the site of the work." The contract also contained the standard Article 3, relating to changes and providing for an equitable adjustment in price.

Plaintiff commenced the contract work immediately upon the execution of the contract and during the first two weeks experienced no difficulty in obtaining a sufficient number of carpenters through the local union at $1.25 per hour. However,

on October 6, 1944, a demand was made by the union that plaintiff pay such of the carpenters as were employed on work which the union construed as "waterfront work" at the rate of $1.42½ per hour, notwithstanding there was no such classification of workers in the schedule contained in the specifications, and no such rate authorized by the contract to be paid carpenters on the project. The basis for the union's contention that plaintiff's carpenters were, for the most part, engaged in "waterfront work" and entitled to a higher rate of pay, is set forth in finding 10. However, the Government's classification and the hourly wage rate fixed under the Act of August 30, 1935, 49 Stat. 1011, as amended by the Act of June 15, 1940, 54 Stat. 399, 40 U.S.C.A. §§ 276a, 276a—1, included and covered all carpenters to be employed on the job.

Plaintiff disagreed with the union's contention, in view of the fact that its carpenters were not working under conditions similar to those pertaining where certain other contractors on earlier occasions had agreed to the higher rate for so-called waterfront construction work, and refused throughout to agree to or to adopt a rate of pay at variance with the wage rate provisions of the specifications. The U. S. Conciliation Service of the Department of Labor having failed to negotiate a settlement of the controversy, the dispute was referred by the Secretary of Labor to the National War Labor Board under the written stipulation of plaintiff and the union agreeing thereto, and the dispute was referred by said Board in turn to the Wage Adjustment Board in the Department of Labor to which it had delegated authority for determining such disputes. After a hearing attended by representatives of plaintiff and the local union, and by the defendant's project manager representing the contracting officer, before a Hearing Officer, and a report by the latter to the Wage Adjustment Board, favorable to the union's contention, the Wage Adjustment Board adopted the Hearing Officer's recommendations over plaintiff's objections thereto and on January 10, 1945, issued a directive order to plaintiff (finding 13) directing it to pay all carpenters employed on the project on waterfront work, as defined in said order, a wage rate of $1.42½ per hour, retroactive to the beginning of the project.

Plaintiff rightly regarded the order to be obligatory upon it, notwithstanding it had consistently opposed the union's demand from beginning to end and had submitted to the Board in writing its objections to the Hearing Officer's recommendations. Nevertheless plaintiff, on January 22, 1945, sought the contracting officer's formal advice on this point (finding 14), and requested confirmation from the contracting officer that plaintiff would be compensated for the extra payments ordered to be made to carpenters on the project. The contracting officer's reply of February 27, 1945, was entirely noncommittal as regards the question of whether plaintiff was obligated to comply with the order of the Wage Adjustment Board. There was no suggestion that the order to pay the increased wages was not obligatory upon plaintiff. The contracting officer rejected any adjustment in the contract price to cover such increased costs, but the letter of rejection was not responsive to the issues raised by plaintiff's letter and in our view did not amount to a decision on those issues by the contracting officer adverse to plaintiff's claim. Coming from the representative of the defendant to whom the contract granted power to make equitable adjustments in the amount payable to the contractor in the event changes should be made by the Government in the specifications, it evidenced little more than indifference to the problem confronting the contractor. The contracting officer said:

Your inquiry was referred by this office to the Office, Chief of Engineers, and that office has advised that the action of the Wage Adjustment Board is no basis for an adjustment in the price of subject contract.

This office regrets that it, therefore, has no choice but to advise you that no adjustment can be made to compensate you for the increased wage rates of carpenters on the job.

The increased wage rate which plaintiff proceeded to pay its carpenters in com-

pliance with the Wage Adjustment Board's order increased its cost of performing its contract by a total of $11,222.91, disregarding any allowance for overhead and profit based on such additional cost. Plaintiff's further effort to secure an adjustment of the contract price to cover the additional costs, by appealing to the Secretary of War from the contracting officer's decision, culminated in the dismissal of the appeal by the War Department Board of Contract Appeals, to whom the Secretary had delegated the duty of determining the appeal, on the ground that the said Board had no jurisdiction to determine the issues involved, notwithstanding its conclusion that the Wage Adjustment Board's order had the effect of increasing plaintiff's costs over and above the amount contemplated when plaintiff submitted its bid.

The question, whether the contract entered into by plaintiff with defendant acting through the War Department could properly be interpreted as obligating defendant to reimburse plaintiff for the increased labor costs which the Board of Contract Appeals concluded the Wage Adjustment Board of the Department of Labor had caused plaintiff to pay, was left unanswered.

We are not certain that the War Department Board had clearly in mind the true issue in the case. We do not doubt, however, the soundness of the Board's conclusion that the determination of plaintiff's claim was essentially a matter for judicial determination.

The issue to be decided is whether or not the Government, in its capacity as a contracting party, has imposed upon the plaintiff a burden of performance which it was not intended by the contract should be borne by plaintiff without an adjustment of the contract price.

In a number of instances we have discussed the principle that it is an implied condition of every contract that neither party will hinder the other in his discharge of the obligations imposed upon him, nor increase his cost of performance. LeVeque et al. v. United States, 96 Ct.Cl. 250; Beuttas v. United States, 101 Ct.Cl. 748, reversed 324 U.S. 768, 65 S.Ct. 1000, 89 L.

Ed. 566; York Engineering Co. v. United States, 62 F.Supp. 546, 103 Ct.Cl. 613, certiorari denied, 327 U.S. 784, 66 S.Ct. 700, 90 L.Ed. 1011; Clemmer Construction Co. v. United States, 71 F.Supp. 917, 108 Ct. Cl. 718; Paretta Contracting Co. v. United States, No. 46395, 109 Ct.Cl. ——, decided October 6, 1947.

Applicability of this principle in a given case depends upon not only the nature of the act which is alleged to have increased the burden of performance but as well upon the intention of the parties, with respect to such act, either expressed or implied in the contract. If the Government, having let a contract which fixed the minimum wages to be paid by the contractor on a certain project, thereafter sets a higher minimum wage level on a separate project at the same site, the court may conclude that in view of the respective undertakings of the parties, as disclosed in their contract, the Government by such conduct cannot be said to have "knowingly hindered" the contractor in his performance, or "culpably increased" his costs, notwithstanding there ultimately results from the Government's conduct a condition wherein the contractor finds it necessary to increase wages in order to insure the timely completion of his work. This conclusion was reached in United States v. Beuttas, 324 U.S. 768, 65 S.Ct. 1000, 89 L.Ed. 566, and by this court in LeVeque et al. v. United States, supra, where, in each instance, the contractor by the express terms of his contract undertook to pay not less than the wage rate prescribed in the specifications, and where the Government, having specifically provided for an adjustment of the contract price in the event the minimum wage rate prescribed should be changed by a certain designated Government official, expressly stipulated that "the Government will not consider any claims for additional compensation made by the contractor because of payment by the contractor of any wage rate in excess of the applicable rate" contained in the specifications, and that "all disputes in regard to the payment of wages in excess of those specified herein shall be adjusted by the contractor." In such cases it is obvious that the Government's act does not directly compel the

contractor to pay the increased labor costs. Whether the particular action of the Government "caused" the increase in wages, in the sense necessary to make applicable the principle referred to hereinabove, must, in those circumstances, be determined by looking closely to what each party to the contract obligated itself to do with respect to the performance thereof.

In York Engineering Co. v. United States, supra, it appeared that no direct action by the Government compelled the contractor to pay increased wages, the court, nevertheless, concluded on the facts that the contractor was entitled to recover its increased labor costs which resulted from the Government's action in raising WPA wages for common labor from 35 cents to 50 cents, a figure in excess of the minimum rate provided for such labor in the plaintiff's contract. The contractor was required by the contract to look to the United States Employment Service for the bulk of its workmen, with a preference in employment given to persons from the public relief rolls. It was found that the WPA wage increase from a rate 10 cents lower than the 45-cent rate the contractor had been paying to a rate 5 cents higher than such rate made it difficult or impossible for the latter to secure labor at its old rate. Notwithstanding the contractor's undertaking was merely to pay not less than the minimum rate the court concluded that the increased cost of performance should be borne by the Government in view of the fact that the contract itself provided that the minimum rate established in the contract should be subject to change by the contracting officer, and that the contract price should be adjusted to compensate for any change he made. These provisions evidenced an intention in the contract to limit the risk which a contractor who agreed to pay "not less than" the specified minimum would otherwise be deemed to have undertaken with respect to increased wages. Though not within the exact letter of the provision excluding from the contractor's undertaking the burden of increased rates ordered by the contracting officer the WPA wage increase fell within its intended scope, since it added a burden of performance of a type the contractor

was not intended to have to bear without an adjustment of the contract price. The fact that the increase was effected by action of the WPA rather than by the contracting officer was considered to be of minor importance.

In Paretta Contracting Co., Inc., v. United States, supra, we held that the plaintiff was entitled to recover its increased labor costs where defendant's representative in charge of the work wrongfully induced the contractor to increase the wages of its laborers from the 65 cents per hour rate, fixed by the contract as the minimum wage, to the 80 cents per hour rate contained in a Wage Adjustment Board ruling issued during the performance of said contract purporting to cover all Federal Public Housing Authority projects in the area where the contractor's work was proceeding. In that case defendant's representative advised the contractor that failure to pay the adjusted wage rate was a noncompliance with the terms of the plaintiff's contract, and that unless supplemental pay roll records should be submitted showing payment of the increased rate the noncompliance would be reported as such to the United States Department of Labor. We expressed the opinion that the project engineer's statement to the contractor, that its failure to pay the 80 cents was a noncompliance with its contract, was erroneous; that the contract there considered required no more than that plaintiff pay a minimum of 65 cents an hour (there was no provision that the wages be computed at rates not less or more than those stated in the specifications subject to Executive Order 9250, such as we find in the present case); that the ruling of the Wage Board amounted to no more than permission to pay as much as 80 cents an hour; and that said ruling did not require the contractor to pay such higher rate. We concluded, however, that in view of certain provisions in the contract the contractor could not afford to ignore the demand made upon it that it pay the higher rate, and that the contractor having paid the increased wages as a result of this wrongful demand by defendant's representative in charge of the work, defendant should pay the increased cost resulting therefrom. We reached this

result on the basis of the principle hereinabove discussed in connection with LeVeque et al. v. United States, supra; United States v. Beuttas, supra; and York Engineering Co. v. United States, supra; notwithstanding in the Paretta case the contract requirement that the contractor pay not less than the wage rate stated in the specifications was not coupled with a provision for change of rate and adjustment of contract price by the contracting officer or any other Government representative, and notwithstanding the declaration in the specifications that the specified rates were minimum rates only, and that the Government would not consider any claims for additional compensation made by the contractor because of payment by the contractor of any wage rate in excess of the applicable rate contained therein. These contractual provisions fairly expressed under certain circumstances the intention of the parties that should the contractor find himself driven to the necessity of paying wages in excess of the minimum in order to obtain workmen he would have to absorb this additional cost of performance without looking to the defendant for additional compensation. But we did not feel that the intention so indicated in the contract could be expanded to encompass a situation where the primary cause of the contractor's paying the increased wages was the Government's demand upon it that it do so.

Defendant's position is (1) that the action of the Wage Adjustment Board furnishes no basis for recovery against defendant because the directive order of said Board did not in fact cause plaintiff to pay the increased wages, and even if such order should be deemed to have been the compelling cause of the increase in plaintiff's cost of performance, the effect of the wage order cannot be attributed to the Government in its capacity as a contracting party, since the order issued as an act of the sovereign; (2) that no undertaking by defendant either express or implied is to be found in the contract for reimbursement of increased costs which plaintiff may incur as a result of giving full effect to the wage provisions of the contract, including the provision with reference to Executive Order No. 9250. These several contentions will be considered in the order stated.

When, shortly after the work began, the carpenters' union at the site of plaintiff's project demanded a higher wage rate than that set forth in the specifications, and plaintiff refused to pay it, work on the project was not suspended but recourse was had by the parties to the dispute to the machinery provided by Federal law for the peaceful settlement of such disputes involving Government contracts. Throughout the proceedings which followed plaintiff continued to oppose the union's demand for a higher rate, and at no time suggested that authority to pay a higher rate was necessary in order for it to retain the services of its carpenters on the job. Instead of seeking authority to pay a rate higher than that fixed in the contract, it consistently maintained the position that no change in rate was warranted. Mention is made in the Government's brief that plaintiff did not at any time invoke the procedure specified in paragraph 1–21(b) of the specifications (finding 4), looking toward a reclassification or an additional classification by the Secretary of Labor for the carpenters who were claiming to be doing "waterfront work." It would have been strange had plaintiff submitted such a request, since it contended from the beginning that no "waterfront work" was involved in the job and that the contract had fixed the wage rate for all carpenters.

Defendant contends that the Wage Adjustment Board's order, adverse to plaintiff's position, came about simply because the parties agreed between themselves to allow the Board to serve as an arbitrator of the dispute and voluntarily enlisted its services. This position ignores the fact previously noted, that both the positive direction in Article 17 of the contract, that the contractor should pay his workmen at wage rates "not less or more than those stated in the specifications," and the declaration in section 1–21(b) of the specifications, that "The wages specified in the schedule shall be the maximum wages to be paid," were "subject, however, to Executive Order No. 9250 and the General Orders and Regulations issued thereunder."

By virtue of Executive Order 9250, referred to in Article 17 of the contract and paragraph 1–21 of the specifications, providing for the stabilization of the national economy, the matter of increases and decreases in wages had been lodged with the National War Labor Board, and this Board acting in accordance with said executive order had issued its General Order 13, whereby it delegated its jurisdiction over labor disputes involving mechanics and laborers in the building and construction industry to the Wage Adjustment Board with authority to hold hearings and issue directive orders in labor dispute cases. The Wage Adjustment Board's directive order of January 10, 1945, defining substantially all the carpentry work on plaintiff's project as waterfront work, and directing that all carpenters employed by plaintiff on such work be paid at a wage rate higher than that stated in the specifications, to wit, $1.42½ per hour, expressly purported to issue in conformity with the National War Labor Board's General Order 13, which General Order in turn had been issued by virtue of the powers vested in the National War Labor Board by Executive Order 9250.

It is apparent, therefore, that when the dispute arose over the carpenter union's demand for $1.42½ per hour, and plaintiff joined in the submission of the dispute with the knowledge and consent of defendant, to the Conciliation Commission and later to the Wage Adjustment Board, plaintiff did no more than adhere to the letter and spirit of the contract to which it and defendant were parties. It was only after the Wage Adjustment Board issued its directive order of January 10, 1945, defining substantially all of the carpentry work on plaintiff's project as waterfront work, and directing that all carpenters employed by plaintiff on such work be paid at a rate higher than that stated in the specifications, that plaintiff paid the $1.42½ per hour demanded by the union.

■ In view of the fact that the contract itself, upon giving effect to the clause with reference to Executive Order 9250, obligated plaintiff to pay its carpenters either the $1.25 per hour specified as both the minimum and the maximum rate, or in the event of a labor dispute such other figure as, under the machinery set up pursuant to Executive Order 9250, it might be directed to pay, we find no force in the point made by defendant that the directive order of the National War Labor Board (or of the Wage Adjustment Board when acting for it), being nonenforceable (see National War Labor Board v. Montgomery Ward & Co., 79 U.S.App.D.C. 200, 144 F.2d 528; National War Labor Board v. United States Gypsum Co., 79 U.S.App. D.C. 239, 145 F.2d 97), did not compel plaintiff to do anything. Aside from the administrative steps which the Board could initiate to discourage any noncompliance with its directive orders (steps looking toward the issuance of directives by the Director of Economic Stabilization to the War Manpower Commission and other government agencies for the withholding or withdrawal of certain priorities, tax benefits, and other privileges connected with government contracts), plaintiff was not free under the provisions of its contract to ignore the Board's directive order. Reading the substance of Executive Order 9250 and General Order 13 into Article 17 of the contract plaintiff was required to pay the figure directed by the Board. If it did not do so, not only was the contracting officer authorized to withhold from the contractor enough of the accrued payments due it to pay the carpenters any deficiency in the amount the contractor was required to pay, but the contractor was subject to the penalty of having its contract terminated. When the plaintiff presented the question squarely to defendant's contracting officer for his formal advice as to whether compliance with the directive order was obligatory upon plaintiff, no suggestion was made by the contracting officer or the Chief of Engineers, to whom the inquiry was referred, that plaintiff was not required to pay the increased rate of wages. We must conclude, therefore, that the Wage Adjustment Board's directive order of January 10, 1945, required plaintiff to pay the increased wages.

■ At this point the defendant makes the argument that the contract under which plaintiff's claim arises was entered into by the Government in its capacity as a con-

tracting party, acting through a contracting officer of the Corps of Engineers, War Department, whereas the act of the Government which brought about the increase in wages, namely, the directive order of January 10, 1945, was done in its sovereign capacity, acting through the Wage Adjustment Board of the Department of Labor. Defendant seeks to invoke the principle involved in Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736, and in the early decisions of this court in Deming v. United States, 1 Ct.Cl. 190; Jones v. United States, 1 Ct.Cl. 383, and in Wilson v. United States, 11 Ct.Cl. 513, as well as in its recent decisions in Gothwaite v. United States, 102 Ct.Cl. 400; Standard Accident Insurance Co. v. United States, 59 F.Supp. 407, 103 Ct.Cl. 607, and Clemmer Construction Co., Inc., v. United States, supra, that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.

We think this principle is inapplicable to the facts of this case. It may be granted, as defendant contends, that the Government in its sovereign capacity and acting for the public good set up a general program to control inflationary tendencies and minimize work interruptions which might interfere with the effective prosecution of the war, and that Executive Order No. 9250 and General Order 13, which issued thereunder, were promulgated as a part of this program. It still does not follow that the action of the Wage Adjustment Board in directing the plaintiff to increase its carpenters' wages can be so isolated under the guise of an act of sovereignty as to permit the Government, in its capacity as a party to the contract, to disavow having had any part in such action, and to disclaim any liability for whatever increased burden this action may have added to the performance of the contract. The increased wage costs for which plaintiff seeks to be reimbursed resulted not from the Government's public and general act in setting up its wartime system for controlling and adjusting wages, nor from any widespread and general application of a device created for this public purpose as a

matter of national policy, but rather from a specific order issued on a particular job by one agency of the Government, to wit, the Wage Adjustment Board, to whom the contracting agency, the War Department, had by a provision of its contract delegated authority to modify the specifications as to wage rates. We think the distinction between the manner of conduct for which the Government was held not liable in the cases above cited, and the act for which plaintiff seeks to hold defendant responsible in the instant case, is obvious.

█ The underlying basis for the doctrine of nonliability of the Government for its general and public acts as a sovereign is well expressed in Jones v. United States, supra, where the court said: In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants.

We know of no reason why the Government may not by the terms of its contract bind itself for the consequences of some act on its behalf which, but for the contract, would be nonactionable as an act of the sovereign. As shown in Bostwick v. United States, 94 U.S. 53, 69, 24 L.Ed. 65, the liability of the Government in such circumstances rests upon the contract and not upon the act of the Government in its sovereign capacity. It was there held that while the Government was not answerable for that portion of the destruction of trees and fences and the removal of stone and gravel from the plaintiff's property which occurred during the wartime occupancy of said property by Federal troops prior to a lease of the premises to the Government, it was answerable in the Court of Claims for that destruction and loss which the troops occasioned during the Government's occupancy of the premises under lease, as voluntary waste within the prohibition of the implied agreement in such lease. The court stated, 94 U.S. at page 69, 24 L.Ed. 65: If there had been in this lease an express agreement to repair, certainly it could not

have been successfully claimed that the Court of Claims would not have had jurisdiction to award damages for a failure to rebuild after the fire, even though the fire was caused by the soldiers while in the hospital for treatment. But the implied obligation as to the manner of the use is as much obligatory upon the United States as it would be if it had been expressed. If there is a failure to comply with the agreement in this particular, it is a breach of the contract, for which the United States consent to be sued in the Court of Claims. All depends upon the contract. Without that, the jurisdiction does not include actions for damages by the army; with it, damages contracted against may be recovered as for a breach of the contract.

It appears in the finding that during the occupancy under the lease ornamental trees were destroyed; fences and walls torn down, and the materials used for sidewalks and the erection of other buildings, or carried away; and that stone was quarried and gravel dug from a stone-quarry and gravel-pit on the premises, and taken away. This was voluntary waste, and within the prohibition of the implied agreement in the lease. For this the Court of Claims can award compensation in this action.

We may concede, for the purpose of this case, that if the War Labor Board, or the Wage Adjustment Board as its agent, had had under consideration and had decided pursuant to Executive Order 9250 a question of national policy concerning wages or wage rates generally or those in a particular industry in connection with the stabilization of the national economy and had decided that for economic reasons to authorize a general wage increase, rather than whether the Government had or had not made a proper classification of carpenters and fixed a proper wage rate therefor, such a broad policy decision applicable to everyone alike would be one which might properly be classified as a sovereign act for which no recovery could be had by a contractor for increased costs occasioned thereby. But on the facts and under a proper interpretation of the contract here involved, we think the action which the Government took in this case through the decision of the Wage Adjustment Board which changed one of the labor classifications and added a new one and changed the wage rate fixed in the contract, was not a decision of the character above-mentioned.

Having concluded that the cause of the increased wages is attributable to defendant as a contracting party, it remains to determine whether under the provisions of the contract this burden should be borne by plaintiff or defendant. Defendant's contention on this point is that the contract provides no basis for requiring defendant to reimburse plaintiff for such increased cost of performance; that plaintiff was not justified in figuring its bid on the basis that no increase in the specified wage scale would be made without an adjustment in the amount payable to it, particularly where, as here, the contract discloses the possibility of wage increases and makes no express provision for reimbursement of the contractor in such event. In such circumstances, defendant says, it was incumbent upon the contractor when making its bid to provide for the contingency that a wage increase might be ordered pursuant to the provisions of Executive Order 9250, since no undertaking on the part of defendant, to reimburse plaintiff for increased labor costs resulting therefrom may properly be implied. In order to reach this conclusion the language employed in both the contract and the specifications with reference to wages must be read so as to exclude every possible implication favorable to plaintiff. The contract documents do not provide merely that the wage rates to be paid by the contractor shall be not less than those set forth in the specifications, nor declare that the Government will not consider any claims for additional compensation occasioned by payment of a wage rate in excess thereof, and that all disputes in regard to the payment of wages in excess of those specified shall be adjusted by the contractor, such as was written into the contracts involved in United States v. Beuttas, supra, and LeVeque et al. v. United States, supra. The contractor is simply told that the amounts to be paid his workmen shall be computed at wage rates "not less or more than" the rates stated in the specifications, and that the wages specified shall be the maximum wages to be paid, "subject, how-

ever, to Executive Order No. 9250 and the General Orders and Regulations issued thereunder." As stated in the LeVeque case such provisions as were there present (but not here) would indicate that the parties were not establishing a wage schedule, but rather a flooring for wages. They evidence an intent that the contractor is to assume the risk of all wage increases in excess of the minimum which subsequent conditions, not the fault of defendant, shall cause him to pay.

It was not usual to find in Government contracts containing such provisions prior to the Stabilization Act of 1942, 56 Stat. 765, 50 U.S.C.A.Appendix, §§ 961–971, and the issuance of Executive Order No. 9250, a provision for change of the specified minimum rates and consequent adjustment of the contract price by the contracting officer or some other representative of the Government, such as was present in the contracts involved in LeVeque v. United States, supra; United States v. Beuttas, supra; and York Engineering Co. v. United States, supra. This was a recognition of the fact that, notwithstanding the contractor was to bear the burden of wage costs in excess of the specified minimum rate should he be compelled for reasons of his own to pay a higher rate in order to complete the performance of his contract, the Government for reasons of its own might desire to alter the minimum rate to be paid on the project, and would not expect the contractor to have to provide for such an uncertain possibility in estimating his bid. Even in the absence of such a provision the Government could not in its capacity as a contracting party compel the contractor to pay wages in excess of the specified minimum rate without subjecting itself to liability for breach of the implied condition that neither party would increase the other party's cost of performance. See Paretta Contracting Co., Inc., v. United States, supra.

The Stabilization Act of 1942 and Executive Order No. 9250 altered the picture. Maintenance of the "prevailing wage" structure during the wartime emergency had become a matter of national concern. Increases over the "prevailing rate", as specified in the contract, were no longer permitted to be made by either the contractor or the contracting agency of the Government unless approved by the War Labor Board. In designating what wages should be paid on a Government contract executed after October 2, 1942, "wage rates not less than those stated in the specifications" were no longer apt words. The rate stated in the specifications was the roof as well as the ceiling unless the War Labor Board approved a change. For like reason a contract provision for change in the specified rate and adjustment of the contract price by the contracting officer was no longer appropriate. The approval by the War Labor Board of any rate at variance with that specified in the schedule was required in all instances.

The contractor and the Government as contracting parties were no longer in a position to evidence, by means of such provisions as those to which we have referred above, their intent respecting the burden of wages paid in excess of the rate specified in the schedule.

In these circumstances we find the printed form of Government contract and the Government specifications, upon which plaintiff made its bid, expressly stating that the wages specified in the schedule shall be the maximum wages to be paid, subject to Executive Order No. 9250 and the General Orders and Regulations issued thereunder. We think this can mean no less than that, for the purpose of this contract, not only must the Wage Adjustment Board approve any increase in rate which either party might desire to pay or have paid in excess of the scheduled rate, but that all choice as to whether a higher rate shall be paid, shall be lodged with such Government agency. The case, therefore, comes down to this. The parties arrived at a price based upon the known factor as determined by the Government and verified by plaintiff, that the prevailing rate for carpenters on the project is $1.25 per hour. That was to be the maximum figure which might be paid under any circumstances unless approval of a higher rate is obtained from the Government as a party to the contract through the Wage Adjustment Board. Occasion might arise after work on the project had begun for an adjust-

ment of the rate upward, which the contractor would be unwilling to make without additional compensation, even though the Board should grant its approval. The Government, as one of the contracting parties, did not wish to make provision in the contract for an adjustment of the wage specification with a resultant adjustment in the contract price, since a change in the wage rate was to be a matter for the judgment of the Wage Adjustment Board. So it was, in effect, provided in the contract that so far as the specifications were concerned with the wage scale to be paid on the project they should be subject to change upon order of the Board, and if the Board directed the contractor to pay a rate other than shown in the schedule as the maximum he must comply, as in the case of any other change in the specifications authorized by the contract. Other changes in the specifications, which the contract left to the contracting officer, or the head of the department, called for an equitable adjustment in the contract price (Article 3 of the Contract). Since the contractor was required to comply with them he was not expected to do so at the original contract price. He was not left to his own foresight or guess in anticipating such changes. We find nothing in the present contract to support the conclusion that the parties at the time of making their contract intended that the contractor should be left to that recourse with respect to a possible change, such as was here made, in the wage specification under authority of Article 17 of the Contract and Executive Order No. 9250.

In view of our conclusions hereinbefore stated, we are of the opinion that the contracting officer not only had the authority but it was his duty under Article 3 of the contract, as plaintiff requested in writing, to carry out the decision made by the Wage Adjustment Board and compensate plaintiff for the extra wages paid by a change order and an equitable adjustment. He declined to do this and plaintiff is entitled to recover.

Plaintiff claims increased wages, insurance and taxes in the amount of $11,492.93, but as stated in findings 16 and 17, the amount payable under the decision and order of the Wage Adjustment Board was $11,222.91. Plaintiff also claims 15 percent for overhead and supervision amounting to $1,723.94 and 10 percent for profit amounting to $1,321.69, but the proof is not sufficient to justify the allowance of either of those items. No extra work or extra employees were required and when plaintiff has been reimbursed for the extra wages paid it will be fully compensated and will be in the same position in which it would have been had the decision and the order referred to not been made and issued.

Judgment will be entered in favor of plaintiff for $11,222.91. It is so ordered.

JONES, Chief Justice, and HOWELL and MADDEN, Judges, concur.

WHITAKER, Judge (concurring).

The specifications in this case stated that $1.25 was the prevailing rate for carpenters. The Wage Adjustment Board found that the prevailing rate for carpenters doing "water front work" was $1.42½, and not $1.25, and that most of the carpenters on plaintiff's job were doing "water front work." As a result plaintiff was required to pay this higher rate.

There was, therefore, a misrepresentation in the specifications as to the prevailing rate for the carpenters on plaintiff's job. Since plaintiff was compelled to pay the higher rate, I think it is entitled to recover for the misrepresentation, inasmuch as its bid had been made upon the basis of the $1.25 rate. This is so, I think, independent of whether or not the action of the Wage Adjustment Board was a sovereign act.

For this reason I concur.

I am authorized to say that Judge MADDEN agrees with this opinion.