**HALLMAN et al. v. UNITED STATES.**

No. 47092.

United States Court of Claims.

Nov. 1, 1948.

See also 68 F.Supp. 204, 107 Ct.Cl. 555.

P. J. J. Nicolaides, of Washington, D. C. (William F. Kelly, of Washington, D. C., on the brief), for plaintiffs.

S. R. Gamer, of Washington, D. C., and H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

MADDEN, Judge.

The plaintiffs, by a contract with the Government made on January 26, 1943, and various supplemental agreements, undertook to reconstruct certain buildings in the army post at Fort Oglethorpe, Georgia, on a unit-price basis, the estimated amount of the consideration being $525,083.20. The work was to be begun on January 28, and completed by May 6, 1943. It was accepted by the Government as completed on May 5.

This suit is to recover extra expenditures incurred by the plaintiffs in the performance of their contract, allegedly caused by stoppages of their trucks and resulting interruptions of the work of their carpenters, which stoppages, they assert, were caused by traffic regulations imposed upon them by the Government. They claim that these regulations and their enforcement amounted to "unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications * * *" within the meaning of Article 4 of the contract, which is quoted in our finding 2. That article further provides that if such conditions are encountered, and are called immediately to the attention of the contracting officer, he shall promptly investigate and if he agrees with the contractor that the conditions are unusual, the contract shall, with the written approval of the Secretary of War or his representative, be modified to provide for the increased costs caused by the unforeseen conditions.

We must therefore first determine whether the conditions encountered by the plaintiffs are covered by Article 4. Part IV—Section 1-05 of the specifications of the contract, quoted in finding 2, required the prospective bidder to visit the site and become familiar with local conditions and difficulties before submitting his bid. The plaintiffs did that, and knew that work was to be done upon practically every building in an army post of small area which was to be occupied by some twenty-five thousand troops for training purposes. In our finding 3 it is shown that it was contemplated that troops would be arriving in great numbers at about the time construction would begin. The fact that the area would be filled with troops and that they would be moving and drilling was not unforeseen. The fact that on an army post troops would have the right-of-way over vehicles, and that, in the aggregate, the contractors' trucks would be stopped thousands of times for troop movements could not have been unforeseen. What, then, happened to delay the plaintiffs' trucks, which was unforeseen or unforeseeable when the contract was made? Originally the plaintiffs claimed that the speed limits on the post had been reduced after the contract was made, but it is clear that this did not happen. The plaintiffs say that after the work was commenced, three traffic signs were erected which said, "Vehicles stop when troops are moving", that they interpreted these signs as applying to all the roads in the post, and that great delays resulted from obeying them. They do not claim that their trucks stopped because troops were moving on some other street, or on land other than the street, but that the signs forbade their trucks to pass moving troops which were marching

in the street even though there was room to pass.

We are convinced that the three signs did not mean what the plaintiffs claim they meant, and that traffic authorities did not so interpret them or enforce them. The three signs were placed at important intersections, and were, we think, intended as a warning that troop movements had the right-of-way there, and elsewhere. There were hundreds of traffic signs on the post, none of which indicated that marching columns could not be passed if their was room to pass, and there is abundant evidence that traffic did so pass, as a regular practice. The plaintiffs do not claim that anyone ever required or advised them to interpret the three signs as they claim they interpreted them. If in fact their truck drivers did follow such an interpretation to the plaintiffs' damage, they did so without reason or necessity, and the plaintiffs may not complain of their having done so. We conclude that nothing unforeseeable in the way of traffic regulations or enforcement was imposed after the plaintiffs made their contract.

Our doubts as to whether the plaintiffs' trucks were delayed for any such periods as the plaintiffs claim, or indeed for any substantial periods for avoidable causes, is reenforced by the plaintiffs' conduct with regard to the problem. In the daily morning conferences with the contracting officer, at some time near the beginning of performance of the contract, their representative complained of traffic delays, and the contracting officer said he would take up the matter with the Post Commander, which he did. It is not claimed that this oral complaint said anything about the plaintiffs' trucks not being allowed to pass moving troops under any circumstances. No noticeable change in traffic conditions resulted from the oral complaint, yet nothing further was heard from it, no intimation was given that the plaintiffs were encountering harmful and unforeseen obstacles, for which they would or might claim additional compensation, until the contract was 98% completed, and it was impossible to ascertain the facts necessary to an intelligent decision on the claim. We think that the plaintiffs wholly failed to comply with the requirements of Article 4 as to calling the attention of the contracting officer to conditions asserted to have been unforeseen. The primary purpose of that provision of Article 4 is to induce in his bid additional amounts to cover all possible, but improbable, events. But this purpose is safeguarded by the requirement that the Government's attention be promptly called to the claimed unforeseen condition, as such, so that an intelligent determination can be made as to whether it is unforeseen within the meaning of the contract, and how much extra expense it has caused. Here the plaintiffs, by withholding their claim until it was impossible to investigate it, obtained a finding of facts from the contracting officer based on guesswork, and seek a judgment from this court similarly based. We think, for this reason also, that the plaintiffs have no rights under Article 4.

The plaintiffs rely strongly upon favorable findings of fact by the contracting officer. These findings are shown by the plaintiffs' own statements to have been wrong in important respects. In their formal claim of May 5, 1943, to the contracting officer, quoted in our finding 14, the plaintiffs in paragraph 4 say that the speed limits about the post were greatly reduced and that it was necessary to employ "an additional number of trucks to overcome these handicaps" and that additional workmen were employed for the same reason. The speed limits were not, in fact, reduced, hence the additional trucks required by the plaintiffs to overcome this imagined handicap could not be the basis of a claim. In paragraph 5 of their claim the plaintiffs said that excessive occupancy of certain buildings and streets by the troops "made it necessary to employ additional trucks and forces." The claim for damages for this "excessive occupancy" of buildings being reconstructed was separately considered by the Department and the plaintiffs were paid $20,-705.79 for their additional expense. The plaintiffs rented an unspecified number of extra trucks, as a result of all asserted causes of delay, reduced speed limit, ex-

cessive occupancy of buildings, and delays in traffic. Yet the contracting officer attributed all their rented trucks to delays in traffic, which was contrary to the plaintiffs' own claim, and none to the reduction in the speed limit, which never occurred, nor to the excessive occupancy of buildings, for which the plaintiffs have been paid.

█ Findings of fact, such as those made by the contracting officer with regard to the expense of extra trucks and extra help caused by the asserted unforeseen stoppages of traffic, which are contradicted by all the evidence and by the plaintiffs' own statements in their claims, are not binding upon us. Further, the contracting officer's oral testimony at the trial, which was in accord with that of the Post Commander, the Provost Marshal and the Post Engineer, all of whom drove daily and frequently about the post, was that the long delays asserted by the plaintiffs did not occur. The contracting officer's finding of unforeseen delays due to strict enforcement of traffic regulations, and admittedly made after the plaintiffs' trucks had practically stopped operating, must have had reference to an unexpectedly large number of brief stops caused by troop movements. The plaintiffs' claim is not founded upon such brief stoppages of its trucks, which could hardly be regarded as unforeseeable in an army post occupied by 25,000 troops in training, but rather upon long stoppages inconsiderately and unreasonably imposed upon it. There are no findings of facts supporting this basis of the plaintiffs' claim, and the evidence given at the hearing does not support it. We have therefore considered the case upon the evidence presented at the hearing and have not regarded the contracting officer's findings as either conclusive or helpful.

It is not necessary for us to consider or decide whether the regulation of traffic at the army post in question was a sovereign act, which, as such, could not be a breach of contract by the Government, Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736; Froemming Bros. of Tex. v. United States, 70 F.Supp. 126, 108 Ct.Cl. 193, or whether a sovereign act might under any circumstances amount to an unforeseen condition within the meaning of Article 4 of the contract.

The plaintiffs' petition will be dismissed

It is so ordered.