**J. S. McGUIRE and G. B. McGuire d/b/a Goose Hill Lodge**

v.

**The UNITED STATES.**

No. 510–58.

United States Court of Claims.
July 18, 1962.
Rehearing Denied Oct. 3, 1962.

State of Missouri (as did other States) retained certain controls, including the right to issue waterfowl regulations, not in conflict with Federal statutes enacted and regulations issued pursuant thereto under the terms of the Migratory Bird Treaty of 1916. It was a cooperative program between the state and Federal governments.

Plaintiffs allege that defendant (1) breached the contract by curtailing the hunting season and issuing unreasonable regulations governing the use of the hunting area by the public, thus reducing anticipated profits and producing financial loss to the plaintiffs, (2) construed the terms and conditions of the contract arbitrarily and unreasonably as to default, determination, and compensation, thus depriving plaintiffs of their rights under the provisions of the contract, and (3) further breached the contract by permitting another party to sell food and refreshments in a trailer on the premises of the Swan Lake Refuge area.

Defendant denies the above allegations and asserts that plaintiff J. S. McGuire was an experienced hunter fully aware before construction of the facility and before the execution of the contract that rules and regulations governing the hunting were to be issued by the Service, and other regulations were issued by the Missouri Conservation Commission pursuant to the laws of the State of Missouri; that the primary purpose of the Refuge was the conservation of migratory waterfowl; that it did not misconstrue or misapply the terms of the contract; that plaintiffs' troubles arose largely from the fact that they were unable to finance their operation; that it cooperated in all reasonable ways in an effort to find a concessionaire to take over the unfinished contract for plaintiffs, and that plaintiffs insisted upon an unreasonable price for the facilities which they constructed.

Thus, the litigants are in practically total disagreement both in the meaning of the disputed terms of the contract and as to the causes of plaintiffs' difficulties and losses.

John A. Ross, Kansas City, Mo., for plaintiffs.

Herman Wolkinson, Washington, D. C., with whom was William H. Orrick, Jr., Asst. Atty. Gen., for defendant.

JONES, Chief Judge.

The issues in this case grow out of a concession contract made with the Fish and Wildlife Service of the United States Department of the Interior, hereinafter referred to as the "Service." The contract was signed on October 5, 1956, but was to cover operations from September 1, 1955, for a 10-year period.

The contract was for the construction and operation of a motel and restaurant facilities to serve the public on the Swan Lake National Wildlife Refuge, hereinafter referred to as the "Refuge," in Missouri. It is one of the largest wild goose refuges in the country. The land was owned by the United States, but the

In the extensive hearings on the case nearly 2,000 pages of oral testimony were taken and more than 100 documents and letters of various types were filed as exhibits.

The trial commissioner has made very clear and detailed findings of fact which analyze the evidence, documents, and issues presented by the parties. Due to the necessary length of the findings of fact and the volume of testimony, we will only repeat the facts necessary to a proper discussion of the issues.

The Swan Lake Wildlife Refuge, one of the largest in the nation, is located in Chariton County, Missouri, on property owned by the defendant. Geese in vast numbers come to this Refuge and to nearby waters. The Secretary of the Interior, on recommendation of the Service, issued waterfowl regulations pursuant to the Migratory Bird Treaty of 1916, 39 Stat. 1702, and statutes enacted under the terms of that treaty. Individual states, including Missouri, also issue waterfowl regulations subject to the requirement that they not be in conflict with Federal regulations and statutes or the treaty. States are authorized to adopt such regulations. States cannot extend the open season on birds beyond that provided by the Federal Government but may provide stricter regulations. Federal statutes and the migratory bird regulations permit this to be done. Pertinent portions of the statutes and regulations are set out in findings 3 to 6, inclusive. These include a cooperative agreement executed March 11, 1955, between the Fish and Wildlife Service, United States Department of the Interior, and the Missouri Conservation Commission for the administration of public waterfowl hunting on certain lands of the Swan Lake National Wildlife Refuge of Missouri. The Missouri statutes provide for enforcement of the law by State officials, authorize arrests by agents of the State Conservation Commission and the promulgation of rules and regulations by the State Commission for the protection of wildlife, including migratory birds.

Pertinent parts of the cooperative agreement are set out in finding 4. It was stipulated in the agreement that "No information or news release affecting basic policy or of a controversial nature shall be issued by either the State or the Service without prior agreement between the State and the Service."

On August 12, 1955, the Service issued a public notice entitled "Proposals for Recreational Use Facilities at Swan Lake National Wildlife Refuge, near Sumner, Missouri." In this notice it advised that the primary purpose of the Refuge was for the management, protection, and conservation of migratory waterfowl. In the Service's notice was this language:

"In cooperation with the Missouri Conservation Department and to the extent consistent and compatible with that objective a portion of the refuge is included in a State administered public shooting area. It is desired to make a small area on the refuge adjacent to the public shooting area available to provide facilities for hunter accommodations. It is the purpose of this notice, therefore, to inform the public of the establishment of a location for recreational use facilities and to invite proposals for the establishment of a concession at such location."

The notice further provided for a concession and invited persons having experience "and financial means to meet the minimum conditions specified in this notice and who desire to enter into negotiations" to address a letter to that effect to the Regional Director. The notice emphasized that the concessionaire should have "[f]inancial responsibility, financial resources, with references, adequate for development and operation of the concession in accordance with the minimum requirements."

By letter of August 17, 1955, the plaintiffs advised the Service that they wished to be considered for an exclusive concession to serve the public on the Swan Lake National Wildlife Refuge. The

plaintiffs stated in the letter that the name of the proposed operating concession would be Goose Hill, Inc., a Missouri corporation to be formed, and that the officers and controlling stockholders would be the plaintiffs. Plaintiffs represented that they had a joint investment which by certified audit as of May 31, 1955, showed $108,000 in Fairfax Plastic Molders, Inc., a Kansas corporation, and, in addition, plaintiffs had saleable machinery in the amount of $50,000. They proposed to erect for the 1955 season 4 units of a 20-unit motel and to add for the 1956 season additional facilities for kitchen, food storage and numerous other facilities adequate for meetings of up to 200 people. Additional representations contained in plaintiffs' letter are set out in finding 7.

On August 19, 1955, the plaintiffs received a telegram from the Service to the effect that the Service would be pleased to negotiate a contract for a concession at the Refuge, and that a draft of a proposed contract would be mailed. On September 1, 1955, the acting assistant regional director wrote the plaintiffs enclosing the form of proposed contract and suggested that the plaintiffs might in the meantime proceed with the construction of facilities "on the basis of data you submitted in response to our Public Notice." Pertinent provisions of the contract are set out in finding 10. The contract was not signed until October 5, 1956. The contract was signed by plaintiffs as individuals and not in a corporate capacity as they had proposed. In the meantime plaintiffs were in partial operation during the season of 1955.

Plaintiffs operated the facilities during the season of 1956. Plaintiffs complained that the hunting season for geese was reduced from 70 to 55 days during the 1955 season and that for the 1956 season individual hunters were not permitted to operate on successive days. However, these regulations were issued by the State Commission which Commission, under the statutes of Missouri, had authority to shorten the season and make other restrictions. Hunters generally were fully aware of this power of regulation as a part of the conservation program.

As a matter of fact, when the entire record is considered we are unable to escape the conclusion that plaintiffs' difficulties arose largely from the fact that they were unable properly to finance their operations. They were unable to dispose of their frozen assets. They were compelled to incur liabilities for the construction program to the extent that it was installed. Several mechanics' and materialmen's liens involving many thousands of dollars were filed. It may be noted in this connection that paragraph 15(c) of the contract provided that the concessionaire should hold the Federal Government, their officers, agents, or employees harmless from liability on account of any claims whatever for wages, supplies, equipment, damage, or injury to persons or property arising out of any activity conducted under the terms of the contract.

Plaintiffs evidently were overoptimistic about what they would be able to do. The plaintiffs testified that they had expected to sell some other property in order to finance the operation but were unable to do so. They did not even have funds to install a telephone for making reservations in the facilities which they had constructed, but use the nearby State office when that office was open.

It also appears from the record that plaintiffs established prices which were rather high for the average hunter. The rooms ranged from $10 for single occupancy to $24 for quadruple occupancy. The food was extra. These prices seemed high for the average hunter, for the type of service which was available. Plaintiffs increased rates for food and lodging for the 1956 season after an unsuccessful 1955 season. The shortened hunting season also contributed to plaintiffs' troubles, but plaintiffs are charged with knowledge that their State under its own laws could shorten the season. Plaintiffs were warned by the Service that there might be a short season in some years. The limits on hunt-

ing on successive days were also within the legal rights of the State. All of this did not reduce the number of hunters as the statistics of record show. The flocks of geese were not dispersed as alleged, although due to hunting and weather conditions the number of geese in 1956 was somewhat smaller than expected. However, the number of hunters was larger in 1956 than in 1955.

In the early part of 1957 the plaintiffs notified the Service that they would not be able to continue operating the concession, and asked that paragraphs 9, 10, and 11 of the contract be put into operation. There is no doubt that defendant did agree to help plaintiffs find a successor concessionaire, and, in fact, did most of the looking and work in that connection. We do not construe the terms of the contract that the defendant agreed to pay plaintiffs for their interest if the search was unsuccessful. Plaintiffs claim the defendant did so agree and that anyway the contract compelled such payment.[1] Following numerous conferences and correspondence, the plaintiffs insisted that the contract had been cancelled and that defendant was obligated to pay the full value of the improvements. Paragraph 10 provides that if the concessionaire shall cease to be authorized to conduct operations and thereafter such operations are to be conducted by a suc-cessor, the Service, as a condition to the granting of a permit or contract to operate, will require such successor to purchase the concessionaire's interest and to pay the concessionaire the fair market value thereof, such value to be deemed the sound value of such improvements at the time of the transfer without regard to the terms of the contract.

Paragraph 10(b) stipulates that if the Service shall determine that during the term of this contract or upon its termination for any reason it is desirable to discontinue the operations authorized thereunder, or any of them, or abandon, remove, or abolish any of the concessionaire's improvements, the Service, before making such termination effective, shall take action to assure the concessionaire of compensation for its interest in such improvements in an amount not less than their book value. The plaintiffs insist that this provision of the contract, which is set out in finding 11, obligates the defendant to pay the full value of all of the facilities when the contract is ended.

Thus, the plaintiffs insist that the defendant is liable to plaintiffs for their expenditures on the property. It will be noted, however, that this would only come to pass in the event the defendant decides that it is not desirable to continue operations. This was never de-

---

1. The writer has long been an advocate of conservation of our natural resources, having been joint author of the act establishing the national "Soil Conservation Service" and other conservation measures. He lays no claim to being an expert on migratory waterfowl. He remembers as a boy the fascination of watching their high and distant flights in a two-winged formation headed by a leader, and the occasional chance to fire a BB gun when they came close which usually only made them fly faster and honk a little louder, but, according to a skilled ornithologist whom he is privileged to know on the Eastern Shore of Maryland, so long as the wild geese, along with the whistling swan and great blue heron, are permitted to go south in the fall and north in the springtime, and are protected in refuges along the line of flight where only limited hunting is permitted under regulation and permits, there will be an abundance of this form of wild life.

This is the primary purpose of the Migratory Bird Treaty and of the state and national laws enacted to implement its provisions and carry out its objectives.

This is the basic thought behind all our laws which provide conservation policies to prevent the depletion of our natural resources and keep them not only for ourselves, but for our children of the future. It is difficult to visualize responsible officials who are charged with any phase of conservation signing a contract which could by any possible construction mean what plaintiffs insist this contract means. The wording of the contract does not support such a construction and the facts of record do not support it. We do not believe it should be so interpreted.

termined. The plaintiffs make the serious charge that the defendant is trying to drag out a settlement for 10 years because by then the property would be fully depreciated and, under the contract, since the defendant would have to pay book value, it could pick up the property for nothing.

There is no evidence in the record to justify such a charge. What delayed action was the dispute between the parties as to the interpretation of the contract. It does not seem reasonable to think that in this great area the defendant would want to deprive the public of the privileges that are granted under the Migratory Bird Treaty and attendant statutes and regulations. As a matter of fact, there was in that particular area a greater flight of geese in 1958 than for many previous years. It is natural to assume that in the interest of the public, as well as in the promotion of the conservation program, hunting under reasonable regulations should be permitted to continue in this vast area. The record indicates that had plaintiffs been able to finance the operations as their letter indicated that they would be able to do and had they been willing to make reasonable charges so that the average hunter could afford to use the facilities, the results might have been different.

Plaintiffs' troubles stem also from using bad business judgment, refusing to mitigate their damages by permitting the Fish and Wildlife Service to let someone operate their concession temporarily which might have aided in finding a successor concessionaire, refusing to take less than book value for their property, and their insistence that defendant agreed to insure them against failure. This refusal to consider any less than book value and their unwillingness to permit temporary operation naturally greatly interfered with securing a successor concessionaire.

Plaintiffs also claim that there was in fact a successor concessionare in that a trailer stand was permitted to sell food and shotgun shells when plaintiffs refused to reopen. But this was long after plaintiffs had insisted that they were financially unable to operate and could not and would not continue to operate the facilities for the year 1957. As a matter of common sense, with the great number of hunters who wanted to come there some effort should have been made to accommodate them. In spite of plaintiffs' complaint, there were more hunters in 1956 than there had been in 1955. There were still many people who wanted to hunt in this great facility and there is no reason why a continued program should not be had. The trailer did not use any of the plaintiffs' facilities. It cannot be considered, therefore, to be a successor concessionaire. It was more in the nature of a hot dog stand. Its operators did, in fact, offer to buy out plaintiffs but at a figure plaintiffs were unwilling to consider.

It is an unfortunate circumstance, but the plaintiffs were unable properly to finance their operations, and they were unwilling to make any adjustment on what they regarded as the value of their property. They insisted upon their interpretation of paragraph 10(b) of the contract. It may be repeated in this connection, however, that the defendant has at no time made any determination that it is desirable to discontinue the concession. Plaintiffs undertook to make that determination. Obviously, it would be much to the public convenience to have the concession in operation. A determination by the Service to discontinue is a prerequisite to payment under the provisions of paragraph 10(b).

This is a rather strange situation. Plaintiffs will not and cannot operate their concession, and defendant cannot. The buyer cannot be found who will satisfy plaintiffs. The facts indicate that plaintiffs will be compelled to take a loss either by taking less than book value from some buyer or ask for arbitration as to the value under paragraph 10(a) of the contract as a means of endeavoring to secure a concessionaire who is willing to take over the property. This court has no power to compel the Service to discontinue the concession.

There is, thus, a stalemate. In the state of the record we have no choice but to dismiss the case.

Plaintiffs' petition will be dismissed.

The defendant's counterclaim will also be dismissed.

It is so ordered.

DAVIS, DURFEE, LARAMORE and WHITAKER, Judges, concur.