AIR TERMINAL SERVICES, INC.

v.

The UNITED STATES.

No. 437–59.

United States Court of Claims.
April 17, 1964.

Jones, C. J., and Whitaker, J., dissented.

Benjamin W. Dulany, Washington, D. C., for plaintiff. Douglass, Obear & Campbell, Washington, D. C., of counsel.

Edwin J. Reis, Washington, D. C., with whom was John W. Douglas, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

DURFEE, Judge.

Plaintiff, a corporation engaged in the operation of concessions at various airports, entered into a contract on October 6, 1957 with defendant, by which plaintiff was granted a concession to operate an automobile parking business at the Washington National Airport. This airport was operated by defendant through its agency, the Civil Aeronautics Administration.

Plaintiff brought this suit to recover damages alleging that defendant breached the contract by installing, without plaintiff's consent, a number of parking meters on streets of the airport; thereby breaching an implied warranty not to substantially alter the pre-existing factual basis under which plaintiff entered into the contract.

Defendant's Invitation to Bid stated in part:

" * * * The government will furnish to the concessionaire the ground space known as Areas 1, 6, 7, 8 and Official, as shown on Exhibit No. 1 attached to the Form of Agreement."

Exhibit No. 1 was a map of the airport showing, among other things, the specific location of the numbered and described parking areas, and also the location of certain employee parking areas. At this time Areas 1, 6, 7 and 8 were the only parking places (other than 62 metered spaces) that were available to the general public for the parking of automobiles.

The aforesaid invitation was accompanied by a "Data Sheet," a copy of the proposed agreement, and a form upon which to submit proposals. The Data Sheet read as follows:

### AUTOMOBILE PARKING CONCESSION DATA SHEET

Effective date to begin operation—October 6, 1957

*Location:*

Parking Areas 1, 6, 7, 8 and official area (see Exhibit 1 attached to proposed agreement)

Normal Capacity:

| Area | Number of Automobiles |
|------|----------------------|
| 6, 7, and 8 | 475 |
| 1 | 400 |
| Official | 20 |

*Existing Rates*—25 cents for three hours or a portion thereof

*Gross Receipts*—12 month period ending 5/31/57—$341,780

Existing monthly utility charges paid by concessionaire—$53.85

Past parking lot activity: A one week sampling indicates the average number of cars entering the parking lot daily to be as follows:

| November | 1956 | 1,248 |
|----------|------|-------|
| January | 1957 | 1,041 |
| April | 1957 | 1,491 |
| July | 1957 | 1,887 |

Total airline passengers enplaned and deplaned (by fiscal year ending June 30):

| *Actual* | *Estimated* | |
|----------|-------------|---|
| *1956* | *1957* | *1958* |
| 3,815,418 | 4,201,199 | 4,500,000 |

The Data Sheet also described the existing method of operation, and allowed plaintiff to submit alternate proposals for other methods. The form for submission of proposals, as amended, stated required minimum guarantee to the Government of not less than $225,000 annually for further use of all specified areas. Plaintiff submitted a rental bid to be computed on a specified percentage of gross receipts, with a guaranteed annual minimum rental of $300,000, and a contract was entered into in substantial conformity with the invitation to bid and the bid, dated October 6, 1957.

Plaintiff commenced operation of the parking lots on October 6, 1957 under a type of operation approved by defendant. The parking time of each automobile was stamped on tickets, and the parking fees computed by an attendant when the automobile left the parking lot, based on the length of parking time.

Since at least 1952, defendant's representatives had given periodic consideration to various plans for reconstruction of the street areas and traffic circle in front of the Terminal Building at the Airport. Increasing traffic congestion and illegal parking in this area were a serious problem. Also, the airport authorities were of the opinion that there was a critical need for additional public parking spaces in this area to accommo-

date the short-term parker whose business in the Terminal Building required him to be there only a few minutes. At the time of its bid, plaintiff was not made aware of these plans.

Final plans for reconstruction of the aforesaid areas were completed, and approved in the spring of 1958. Construction began in July, and was completed in October of the same year. The changes thus made were substantial. The traffic circle and the traffic island partially surrounding it were both reduced in size considerably; two adjacent triangular-shaped islands were also cut to a much smaller size; and the median strip on Smith Boulevard was removed. The primary reason for these changes was to provide greater street width for loading and unloading purposes and to expedite a safe flow of traffic in this congested area. In this respect, the changes were successful and resulted in an improved flow of traffic, which also required additional short-term public parking space under the control of parking meters in the area adjacent to the Terminal Building. To this end, defendant provided 101 additional metered parking spaces around the traffic circle and along Smith Boulevard to the vicinity of the entrance to the public parking lots. A number of considerations influenced defendant's representatives in deciding to install this large number of new parking meters in the terminal area. Although an absolute prohibition against any parking in the area would have furthered the primary objective of improving the flow of moving traffic, the C.A.A. representatives felt that some short-term parking spaces near the terminal were essential to properly handle traffic in that area. Free parking under the control of signs containing a time limitation is considerably more difficult to enforce than parking by meters, which provides police with a simple visual indication of violations, and hence results in a desirable rapid turnover and efficient use of available spaces. In addition to their primary regulatory functions, parking meters have the desirable advantage of producing substantial revenues to the Governmental owner.

For these reasons, in October 1958, defendant installed 101 additional parking meters on the traffic circle and Smith Boulevard, as above described. Then in February 1959, defendant removed seven meters at the traffic circle and installed 28 new metered parking spaces on the street in front of the recently completed North Terminal Building which is directly across the street from the rear, or eastern boundary, of plaintiff's Lot No. 1. Thus, during these periods, a new total of 122 new metered parking spaces were added by defendant.

The record shows that thereafter on June 15, 1959, plaintiff's attorney wrote and advised the Federal Aviation Agency of its intention to file suit because of the installation of the additional meters by the Government. By reply dated July 17, 1959 the F.A.A. furnished additional operating data, and also denied that by virtue of the contract, plaintiff became the sole parking concessionaire at the airport. Plaintiff filed its petition here on October 9, 1959 for breach of contract, but continued to operate through September 1960 for the full three-year period of the contract.

During the first six months of the contract period, plaintiff suffered a net loss in each month ranging from a low in October 1957 of $1,311 to a high in February 1958 of $6,846. The five months beginning with April 1958 showed a net profit. However, in September 1958 plaintiff again suffered a net loss, although in a relatively small amount. For the succeeding 18 months, plaintiff suffered a net loss in each month; the total loss for the period averaged about $4,100 per month. During the last six months of the contract, plaintiff had net profits in three of the months and net losses in the remaining three, all being in relatively small amounts except for a net profit of $4,125 in the last full month of the contract.

Plaintiff's revenues from long-term parking (over 25 cents parking fee), with some variations, increased from $222,972.94 in its first year of operation, to $275,616.77 for the third and last year. Plaintiff's short-term parking (25 cent

fee) revenue rose quite steadily during the first year of operation from $7,281.25 in October 1957 to $13,836.75 in August, and $9,127.50 in September 1958. From the time that defendant began to install its additional parking meters in October 1958, plaintiff's revenues from short-term parking, which had previously shown an upward trend, began a sharp decline from which they never recovered. The short-term revenues fell from a total of $111,609.75 for the first year to $44,257.00 for the second year, and $36,533.25 for the third year.

The only significant change in conditions at the airport which bore directly on short-term parking was the installation of the 122 new parking meters in October 1958 and February 1959. Although there were other adverse factors, this installation of new meters by defendant was the primary and proximate cause of the sharp decrease in plaintiff's short-term parking revenue.

Plaintiff's action is based upon a claim of breach of an implied warranty that defendant would not unilaterally hinder or make more burdensome plaintiff's performance of its parking concession contract with defendant. When defendant in 1957 furnished its "Data Sheet" to plaintiff with information as to existing operations of the parking concessions, including gross income therefrom, plaintiff contends that it had a right to rely upon an implied warranty that the basic factual data and the competitive position of the parking concessionaire would remain reasonably constant throughout the three-year period, and that defendant would not unilaterally alter this pre-existing factual basis.

We do not adopt this interpretation of the circumstances under which this contract was made. The contract did not expressly or implicitly warrant what plaintiff contends. Plaintiff knew when it bid that there were already 32 competitive parking meters in the street adjoining the Terminal Building and free employee parking at the airport. Despite the fact that plaintiff had a number of other exclusive contract concessions at the airport, it never asked for an exclusive concession for the parking lots. Defendant never intended to grant one, and none was included in the contract.

Plaintiff's bid was prepared by one of its executives, C. J. Sabatino, who had previously and successfully prepared bids for parking concessions for plaintiff at several other airports. In addition to his expertise in analysis of airport parking concessions, Sabatino was generally familiar with the layout of the Washington National Airport and its parking areas. He knew that about 30 competitive public parking meters had been previously installed by defendant near the Terminal Building, in addition to employee parking space.

The regulations of the Civil Aeronautics Administration published in the Federal Register, provided that the Director of the Airport could designate areas on streets and roadways for limited parking, and could control these parking spaces by meters. By statute, the public is charged with knowledge of these regulations, and in view of plaintiff's extensive experience in airport parking concessions prior to entering into its Washington Airport contract, it had at least constructive knowledge thereof. Plaintiff had no reason to assume that the Airport Director would not exercise his authority under these regulations to enlarge the streets and to provide additional limited parking space with metered control in the additional areas thus provided. Such an implied condition or warranty cannot be read into this contract.

■■ Plaintiff entered into this contract with full knowledge that defendant was already competing with the parking lot concession with 32 Government parking meters on the streets and circle adjoining the Terminal Building, and with an employee parking space. Although the Government had previously contemplated changing and enlarging the street and traffic rotary areas, including the addition of limited parking thereon with meter control, as well as the potential need for more public parking areas at

the airport, and had prepared studies and plans accordingly, it does not appear that any definite decision had been made at the date of contract. The Government did not desire to restrict any possible future parking developments. Perhaps the Government should have divulged its future intentions of expansion of its own competitive parking meter operation when it asked for bids, but its failure in this respect cannot be charged as bad faith or fraud. Even though plaintiff depended largely upon the data furnished by defendant in making its own expert analysis, it had no right to assume that the Government would not make changes which would alter or enlarge the existing competitive situation.

The Government did not establish new parking lots in competition with plaintiff's concession space after making the contract. It expanded its existing operation by installing the new meters along the streets and roadways in the area where it had already installed and operated 32 meters.

In Bateson-Stolte, Inc. v. United States, Ct.Cl., 1962, 305 F.2d 386, this court considered the circumstances under which implied provisions not to hinder performance would be assumed as part of a contract. Where the evidence showed that defendant would not have expressly agreed to such a provision in the contract, the court said, 305 F.2d at 389:

> "* * * Since defendant would never have expressly agreed to such a provision, it cannot be successfully contended that defendant impliedly agreed to it."

In the present case, the record establishes that in view of its future plans, the Government would not have agreed to any provision in the contract which would have prevented its contemplated expansion of the streets and circle, and control of parking thereon by parking meters, and no such provision can be implied. The record also establishes that the Government, prior to the contract, had decided not to give the concessionaire any exclusive franchise.

In the case of McGuire d/b/a Goose Hill Lodge v. United States, Ct.Cl., 1962, 305 F.2d 449, plaintiff had a Federal concession to run a hunting lodge in a wild-life refuge area. Plaintiff contended that, after making the contract, the Government reduced the hunting season for geese, thereby making the refuge area less attractive for hunters; and breaching an implied condition of its contract not to hinder or render performance of the contract more difficult. The court held that there was no such implied warranty or agreement; that hunters generally were aware of the power of the State and Federal Government to regulate the hunting season for geese in the interests of conservation.

Any implied agreement or warranty by the Government not to materially alter the existing competitive situation would have the clear effect of preventing any further control of parking by the Government through the use of additional parking meters in additional street and traffic circle space adjoining the Terminal Building. This regulatory authority had been expressly delegated to the Federal Aviation Agency by express published regulation. Although parking meters produce substantial revenue, their primary function for the Government is to control parking through rapid turnover and most efficient use of available space in congested traffic areas. In the words of our decision in the Goose Hill Lodge case, supra, "[i]t is difficult to visualize responsible officials who are charged with any phase of conservation signing a contract which could by any possible construction mean what plaintiffs insist this contract means." It is equally difficult for us to now envision the C.A.A. signing a parking concession contract which by implication would prevent the Government from changing its own existing parking operation.

We therefore find that there was no implied condition in plaintiff's concession contract that the competitive sit-

uation, as it existed at the time of making the contract, would not be altered by defendant or that it would remain substantially undisturbed for the term of the contract.

Accordingly, we conclude that there was no breach of the contract by defendant's installation of the 122 new metered parking spaces after the date of the contract.

██ Defendant also contends that the installation of the additional parking meters after the making of the contract in October 1957, and their subsequent operation by defendant during the period of the contract, was a sovereign act for which the United States is not liable in contract.

The primary purpose of the Government in the new installation was the regulation of short-term parking in a congested traffic area adjoining, or close to, the Airport Terminal Building, as part of a plan of enlargement of facilities for regulation and control of the increasing traffic in this specific area.

The traffic regulations were prescribed by the Administrator of the Civil Aeronautics Administration through authority pursuant to an Act of Congress, 54 Stat. 687, § 2, 7 D.C.Code § 1302.

The Administrator accordingly adopted regulations governing operation and parking of automobiles, including the following:

"*Parking.* (a) No person shall park any motor vehicle on the airport in excess of the time limit prescribed by the airport director for the particular parking area.

\*   \*   \*   \*   \*   \*

"(c) No person shall park a motor vehicle in a metered parking space without depositing in the parking meter controlling such parking space the required sum of money for the length of time stated on such meter, \*   \*   \*." [14 C.F.R. § 570.27.]

The meters plaintiff here complained of had a notice thereon stating:

"Police regulation. Insert coin. One hour limit. One dime thirty

minutes, two dimes sixty minutes. Use dimes only. Meter parking enforced at all times including nights, Sundays and holidays." [Steiner, Tr. 655.]

Criminal penalties were also particularly prescribed for the violation of these regulations [14 C.F.R. § 570.131]:

"*Penalties.* (a) Any person who knowingly and willfully violates any rule or regulation prescribed in this part, on any order or instruction issued by the airport director authorized herein, shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $500, or imprisoned not more than six months, or both."

The Commissioner has found that:

"The record shows that, with the relatively small police force at the Airport, it was exceedingly difficult to enforce parking regulations without the assistance of parking meters. (Fdg. 16.)

The Trial Commissioner further found that in addition to their primary regulatory functions, parking meters have the desirable advantage of producing substantial revenues to the Governmental owner. However, this additional financial benefit does not change the primary function of parking meters in public regulation of traffic and parking.

In Wah Chang Corp. v. United States, 282 F.2d 728, 151 Ct.Cl. 41 (1960), plaintiff contended that the condemnation of a pier leased and required by plaintiff for its operations was a breach of an implied condition of its contract with the Government that neither party would do anything to prevent, hinder or delay the performance of the other. The court said, 282 F.2d at 734, 151 Ct.Cl. at p. 50:

"Within the rule that prevention of performance by the other party constitutes a breach of contract there has been carved out the exception or qualification 'that the United States as *contractor* cannot be held liable directly or indirectly for the public acts of the United States as a

*sovereign.'* Jones v. United States, 1865, 1 Ct.Cl. 383, 385."

This doctrine had received the approval of the Supreme Court in Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1925).

Traffic regulations have been specifically held by this court to be sovereign acts for which the United States is not liable in contract. Hallman v. United States, 68 F.Supp. 204, 107 Ct.Cl. 555 (1946).

The use of meters to regulate parking and to collect a fee therefor is designed to diminish the vice of overtime parking and consequently speed up traffic, and has been held to be a police power function of traffic regulation on the public streets. Automobile Club of Missouri v. St. Louis, 334 S.W.2d 355, 83 A.L.R.2d 612 (Mo. 1960); Kimmel v. City of Spokane, 7 Wash.2d 372, 109 P.2d 1069 (1941).[1]

A parking meter has been defined as a clock set on a post which measures the time of parking *and provides mechanical assistance in the enforcement of the parking limitation.* Cassidy v. City of Waterbury, 130 Conn. 237, 33 A.2d 142 (1943).

We conclude that the regulation of traffic and parking by defendant through the use of parking meters at the Washington National Airport was primarily a public· and general act of sovereignty performed for the public good within the meaning of the Horowitz case, supra, and was not arbitrary and unreasonable so as to remove it from the category of sovereign acts which do not constitute breaches of implied terms in the contracts of the United States. Wah Chang Corp. supra, and cases therein cited.

Plaintiff is not entitled to recover, and therefore its petition is dismissed.

Defendant has asserted a counterclaim. Under the contract plaintiff agreed to pay a specified per centum of gross receipts in excess of the guaranteed minimum. Plaintiff was required to furnish a certified statement to defendant of all of its gross receipts each month. The basis of the counterclaim is the assertion by defendant, on information and belief, that plaintiff received parking fees in excess of the amounts reported as gross receipts, the amount of which was unknown to defendant. Plaintiff denied this in its reply to the counterclaim, and asserted that it had correctly reported its gross receipts.

The Trial Commissioner has found that if defendant is entitled to recover on its counterclaim, the amount reasonably allowable is $9,565.88. Neither party has excepted to this finding, and plaintiff in the conclusion of its brief, asserts that it is entitled to a judgment in the total amount of its claim "less the set-off of defendant's counterclaim ($9,565.88)." Defendant makes no reference to the counterclaim in its brief. We conclude that defendant is entitled to recover on its counterclaim in the sum of $9,565.88. Judgment is entered for defendant in this amount.

JONES, Chief Judge (dissenting).

I do not question the immunity of the Government from liability for its essential sovereign acts, but I do think it important to realize that whether the action taken should be classed as such a sovereign act as would justify an exemption from liability depends upon the setting and facts of the particular case; also it is important to determine whether some other action might have served the purpose.

Just because the Government has the sheer power to claim that a certain action was taken in its asserted sovereign capacity does not mean that a Government agency may disregard its voluntary contract obligations, nor that it may ride roughshod over the citizens' rights by

---

1. Other cases in point are: Bloomington v. Wirrick, 381 Ill. 347, 45 N.E.2d 852 (1942) cert. denied 319 U.S. 756, 63 S.Ct. 1175, 87 L.Ed. 1709; Bowers v. Muskegon, 305 Mich. 676, 9 N.W.2d 889 (1943); Roswell v. Mitchell, 56 N.M. 201, 242 P.2d 493 (1952); Wm. Laubach & Sons v. Easton, 347 Pa. 542, 32 A.2d 881 (1943).

simply donning the cloak of immunity without showing a necessity for doing so. That would mean going back more than 100 years to the time when we still had the reflected doctrine of "the King can do no wrong."

The question here is not whether the Government may perform an essential sovereign act. That is conceded. The question here is whether there was sufficient necessity for the particular act to justify the Government interfering with the successful operation of its own contract without any adjustment of damages caused to one of its own citizens, who was the other party to the contract.

When the Government enters into a contract it should carry out its terms in good faith, and invoke its great power of a sovereign act when and only when and to the extent necessary to carry out its essential governmental functions. As was stated by Chief Justice Waite in the case of Cooke, et al. v. United States, 91 U.S. 389, 398, 23 L.Ed. 237 (1875):

"If it [the Government] comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there."

In Goldblatt v. Hempstead, 369 U.S. 590, 591, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), in which, commenting on the effect of a Government regulation on an outstanding contract, the Supreme Court said:

"This is not to say, however, that governmental action in the form of regulation cannot be so onerous as to constitute a taking which constitutionally requires compensation. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 [43 S.Ct. 158, 67 L.Ed. 322] (1922); see United States v. Central Eureka Mining Co., supra [357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228]. There is no set formula to determine where regulation ends and taking begins. * * *

" * * * The classic statement of the rule in Lawton v. Steele, 152 U.S. 133, 137 [14 S.Ct. 499, 501, 38 L.Ed. 385] (1894), is still valid today:

'To justify the State in * * * interposing its authority in behalf of the public, it must appear— First, that the interests of the public * * * require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.' " [pp. 594–595 of 369 U.S., p. 990 of 82 S.Ct., 8 L.Ed.2d 130.]

Thus, to come within the rule of immunity for a sovereign act, the action taken must be (1) in the public interest, (2) must have general rather than a specific or local application, and (3) if it goes too far it will be recognized as a taking.

There are a number of reasons, good and sufficient, which should preclude exemption from liability in the present case:

1. The defendant owned all the land involved here. There was no other convenient area which could be used by a competitor for parking purposes aside from the land owned by the Government. At the time of signing there was nothing in the appearance of the premises to indicate the possibility of competing parking space, and certainly no indication that the Government meant to change the premises.

2. As an inducement to bidders, the defendant submitted a data sheet showing gross receipts from this particular parking area for the previous 12-month period to have been $341,780. It disclosed the total number of airline passengers enplaning and deplaning for the two previous fiscal years. It showed an increase in passengers in 1957 over the number of such passengers in 1956. It submitted an estimated increase of a substantial percentage for the year 1958. The invitation also stated that the Government would not consider a proposal which contained a minimum guarantee of less than $175,000 for each contract

year. The Government later increased this minimum to $225,000 per year. The contract as actually signed required plaintiff to pay the defendant 86.4 percent of the gross receipts up to $360,000 per annum; the percentage increasing up to 95.1 percent of all receipts above $400,000 with the guarantee of minimum rental of $300,000 per annum, whichever was greater.

3. At the time of the letting of the concession contract, the defendant had in contemplation and under discussion a plan to increase the number of parking meters. It did not disclose this fact to the bidders. I believe, in fairness, the Government owed the duty to have told plaintiff before the contract was signed of its contemplated increase of parking meters. As early as 1956 the defendant's representatives were seriously considering various proposals for increasing the number of parking meters in this general area, but this fact was not in any way disclosed to plaintiff prior to or at the time of signing the lease contract. There can be no question that plaintiff was misled to its damage by the Government's withholding of information. (Finding No. 7.) Defendant's withholding of information, under the circumstances of this case, amounted to a breach of contract under the holding of this court in Ragonese v. United States, 120 F.Supp. 768, 128 Ct.Cl. 156 (1954). See United States v. Atlantic Dredging Co., 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1920).

Judge Learned Hand in Heil v. United States, D.C., 273 F. 729, at page 731 (1921), used the following language:

"* * * Whatever be the justification in policy of the sovereign's immunity, the first consideration ought to be this: That in the performance of its voluntary engagements with its citizens it should conform to the same standard of honorable conduct as it exacts of them touching their conduct with each other. Any policy which would exempt the United States from the scrupulous performance of its obligations is base and mean; it serves in the end to bring the United States into contempt, to prejudice it in its dealings when it enters into the common fields of human intercourse, and to arouse the indignation of honorable men. Congress by the Tucker Act meant to avoid such consequences."

4. After the contract had been signed, the defendant widened the so-called street or driveway, reduced the island circle so as to make more room, removed the no-parking signs that had been placed on some of the narrower places, installed 122 new meters from which the Government collected and pocketed the money, and at the same time continued to exact the minimum guaranty rental from the plaintiff even though plaintiff's receipts concurrently went down through the remaining 2 years of its contract, causing the plaintiff to lose money during that period. During the same 2 years the defendant's income from parking meters leaped from $21,000 during the previous years before the new meters were installed, to $88,353 during the first year after the installation of the new meters (the second year of the contract), and to $98,304 during the third year of the contract. Plaintiff's receipts were correspondingly reduced during this period.

The primary cause of the decrease in plaintiff's short-term parking revenue was the installation by defendant of the 122 new parking meters after the contract had been signed. (Finding No. 16.)

The so-called "parking regulation" did not rise to the dignity of a sovereign act, but sank to the level of a local rule of convenience. It was an affirmative act on the part of the Government which caused plaintiff's receipts to be reduced substantially and it turned what would have been a profitable concession into one that entailed a substantial loss. This was an act of interference on the part of the Government which the circumstances of this case do not justify. State of California v. United States, 151 F. Supp. 570 (N.D.Cal.1957); Bateson-

Stolte, Inc. v. United States, 172 F.Supp. 454, 145 Ct.Cl. 387 (1959); Sunswick Corporation v. United States, 75 F.Supp. 221, 109 Ct.Cl. 772 (1948).[2]

We quote from the opinion of the Supreme Court in the Pennsylvania Coal Company v. Mahon, 260 U.S. 393, at 415, 43 S.Ct. 158, at 160, 67 L.Ed. 322 (1922), as follows:

"* * * When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.

"The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."

The particular regulation was not necessary. There were other means of controlling the traffic in the area without installing meters, e. g., the findings state that "[a]lthough an absolute prohibition against any parking in the area would have furthered the primary objective of improving the flow of moving traffic, they [defendant's representatives] felt that parking spaces near the terminal were badly needed to accommodate the short-term parker." Why did the Government choose the installation of parking meters of its own to control traffic when other equally effective methods were available which would not interfere with plaintiff's successful operation of the leased parking area? It could have permitted plaintiff to install and operate the additional meters or to operate them after defendant had installed them. It could have made an adjustment in the rental guarantee. It could have adjusted the contract price. It could have permitted plaintiff all net profits arising from the extra meters it installed to be applied as a credit on the payments otherwise due the defendant. It could have credited all receipts from the extra meters, less actual operating costs, to a reduction in the contract price. It could have had an unloading zone without parking meters. There were many ways of adjusting the situation without brusquely ignoring its own obligation under a contract of its own choosing. Is it possible that the officials in charge were persuaded by the fact that the Government would get more money even though the increased revenue would be at the expense of one of its citizens who had contracted in good faith with the Government? Without ceremony, negotiation, or adjustment, it used its stark power to destroy a contract which it had initiated.

This was an attempt to bring far more under the protective umbrella of a sovereign act than can be logically brought within its appropriate shelter.

It is one thing to exercise the power of sovereign immunity when it is an essential part of progress and development. Every property owner is aware of this latent power before he becomes the owner of property. But it is an entirely different thing for the officials of Government to place a show window outside the gates depicting the advantages of a contract to be performed within its enclosure; and then after a contract is signed, and without previous notice, to throw a road block in the form of affirmative acts of interference which destroys any chance of a successful operation of the contract, which they had invited.

2. It is stated in the opinion of Wah Chang Corporation v. United States, 282 F.2d 728, 733, 151 Ct.Cl. 41, 49 (1960).

"This court has held that it is 'an implied provision of every contract, whether it be one between individuals or between an individual and the Government, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance.' George A. Fuller Co. v. United States, 1947, [69 F.Supp. 409], 108 Ct.Cl. 70, 94. See also United States v. Peck, 1880, 102 U.S. 64 [26 L.Ed. 46]; 5 Williston, Contracts § 1293A (Rev. Ed. 1937); Restatement, Contracts § 315."

Does anyone believe the Government, after signing a written 3-year lease contract, could have immediately widened the street and installed parking meters along the entire frontage of the leased parking area, thus destroying the value of the lessee's contract, and still have escaped any liability? That is, in effect, what they did as to the short-term parking privilege. The action of the Government in installing these meters should not be classed as an act of the sovereign with the attendant immunity because it bears no relationship to the "means * * * reasonably necessary for the accomplishment of the purpose" of decreasing traffic congestion, and because the action was "unduly oppressive upon" plaintiff. Goldblatt v. Hempstead, supra; Lawton v. Steele, supra.

Plaintiff was held to the rental payments in spite of its losses occasioned primarily by the action of the Government in installing the new meters. This is swinging the "sovereign act" weapon with a vengeance.

Today, as the activities of Government become more complex and the Government is engaging in wider fields of activity, the need is becoming manifest that there should be a more accurate definition of the term sovereign act and a more flexible application of its effects on day-to-day activities. As we enter the electronics and space age, the contracts with the Government will become vastly more complicated. Already the Government is necessarily spending billions on national defense involving immense contracts. The Nation's business, which was once primarily local, has become largely interstate, greater sums are being and will be spent on conservation projects, irrigation, soil and water conservation, as well as military and other development projects.

If the contractors on these great projects are to be met at frequent trouble spots with the plea of a sovereign act as a defense against the Government's interference with their operation of public contracts, they will of necessity take these road blocks into consideration in calculating and submitting their bids. The costs to the Government will be higher, the irritations and misunderstandings will be greater and court dockets more crowded.

It would be in the interest of all concerned if either the limits of the term could be better defined or if a more flexible approach to the old harsh doctrine could be had, especially in peacetime periods. As it is, the contractor must face the uncertainty; the lawyers for the defense must raise the defense of a sovereign act if there is any possibility of its application; the lawyers for plaintiff must continue to insist that it does not apply—thus carrying on a continuing cold war. That conflict is gradually ripening into a real battle, with the litigants charging back and forth across a no-man's land, with the courts being caught in the middle. As in most modern wars, everyone loses.

The Government's immunity from the consequences of a sovereign act is a valuable and essential right. It should be invoked where and to the extent it is applicable. But it is a powerful weapon and should not be used in too wide a field or to cover inappropriate matters under the guise of necessary protection for the Government. It is fitting to say, "O, it is excellent to have a giant's strength; but it is tyrannous to use it like a giant." [3]

Defense counsel seeks to include within its broad sweep a number of acts by officials of the Government which definitely lap over into the field of interference with the normal operation of its own contracts.

Also from Ottinger v. United States, 88 F.Supp. 881, at page 883, 116 Ct.Cl. 282, at page 285 (1950):

"* * * It [the Government] needs no such immunity in order to be able to go on governing wisely and as circumstances require without being hampered by its outstand-

---

3. "Measure for Measure," Act II, Sc. 2, line 107.

ing contracts. We think that to treat every act of a Government agent, done in the name of the Government, as an act of sovereignty within the meaning of the doctrine here under discussion would be a retreat, without reason, from the purpose of the statute permitting citizens to sue the United States for breach of contract."

The facts and circumstances of each case have a bearing on the ultimate application of the doctrine of exemption from liability due to a sovereign act. The record does not justify its application in the instant case.[4]

The facts of record are wholly insufficient to justify the allowance of an independent counterclaim apart from a finding for plaintiff on the general issue.

I would allow plaintiff to recover the sums calculated in the trial commissioner's findings which we have approved as the findings of the court. These findings are based on the actual losses which are shown by the evidence to have been the direct result of the affirmative acts of interference on the part of the defendant.

It would be wholly insufficient to allow the plaintiff the net profits from the meters. No doubt the widening of the streets, and the reducing of the center island, plus the cost of buying, installing, supervising, repairing and collecting from the parking meters was nearly as great, perhaps greater, as the income from the meters during the two remaining years of plaintiff's lease. It was evidently a long-range program. Besides, the defendant's action destroyed all profits from plaintiff's lease and his actual loss was greater than the amount found by the trial commissioner.

WHITAKER, Judge (dissenting):

This is a close case, but I rebel against the idea of the Government's making money out of the renting of additional parking spaces, in competition with plaintiff. Especially so, since these spaces were much more convenient to the terminal building and much cheaper than the price plaintiff was, under its contract, permitted to charge. Not only did the Government enter into competition with its lessee, but also it was unfair competition. No one would park his car in plaintiff's lots if one of these metered spaces was available.

When the street in front of the entrance to the Washington National Airport Terminal Building was enlarged, more parking places became available. What were the airport authorities supposed to do with them? (1) They could have prohibited parking altogether. Plaintiff would not complain had this been done, but this would seem to have been contrary to the public interest. (2) They could have put up signs limiting the time for parking. This would have hurt plaintiff financially about as much as what they did do. (3) They could have installed and did install parking meters, which had the advantage of deriving revenue from the restriction of the time for parking.

We have, then, a conflict between the obligation of the Government to refrain from doing anything to detract from the lawful enjoyment by its lessee of the

4. It should be noted that while in the original opinion of the court in Hallman v. United States, 68 F.Supp. 204, 107 Ct. Cl. 555 (1946), cited by the majority herein, the Government's demurrer to the petition was sustained and the petition dismissed on the ground that the traffic regulation involved therein was a sovereign act, the demurrer to plaintiff's amended petition was later overruled, and after a trial on the merits the court, in its final opinion, 80 F.Supp. 370, at page 373, 112 Ct.Cl. 170, at page 187 (1948), stated that it was "not necessary for us to consider or decide whether the regulation of traffic at the army post in question was a sovereign act, which, as such, could not be a breach of contract by the Government, Horowitz v. United States, 267 U. S. 458, 45 S.Ct. 344, 69 L.Ed. 736; Froemming Bros. of Tex. v. United States, 70 F.Supp. 126, 108 Ct.Cl. 193, or whether a sovereign act might under any circumstances amount to an unforeseen condition within the meaning of Article 4 of the contract."

privilege which it had contracted and paid for, on the one hand, and, on the other hand, the obligation of the sovereign to facilitate the flow of traffic. (Quite clearly parking facilities are a necessary adjunct of traffic flow; there is no point in driving one's car to a place unless there are means of disposing of it after one gets there.) How can this conflict be resolved?

Would it not be fair and equitable, both to plaintiff and defendant, to allow plaintiff to recover from defendant whatever net profits it derived from the operation of these additional parking meters? It seems so to me, and I would enter judgment to this effect.